UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                      Case No. 11-CR-69

ROLAND J. FLATH,

          Defendant.

## GOVERNMENT'S RESPONSE AND OPPOSITION TO MOTION TO DISMISS

The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Penelope L. Coblentz, Assistant United States Attorney, for said district and Mi Yung Park, Trial Attorney, United States Department of Justice, Child Exploitation and Obscenity Section, hereby respond to the defendant's motion to dismiss the indictment as exceeding Congress's power under the foreign commerce clause and for violating international law. For the reasons set forth below, the motion should be denied.

## I. PROCEDURAL HISTORY

On October 7, 2010 a Complaint was filed alleging that defendant traveled in foreign commerce, from the United States to Belize, and then engaging in and attempting to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(c). On or about February 23, 2011, the defendant was arrested on the arrest warrant issued pursuant to the Complaint. On March 22, 2011, a grand jury sitting in the Eastern District of Wisconsin returned an indictment against defendant alleging that the defendant, a citizen in the United States, with his last known

1

residence with the State and Eastern District of Wisconsin, did travel in foreign commerce, from

the United States to Belize, and engage in and attempt to engage in illicit sexual conduct as

defined in Title 18, United States Code, Section 2423(f), with a person less than 18 years of age

in violation of Title 18, United States Code, Section 2423(c) and (e).

## II.  STATEMENT OF FACTS

The Defendant, Roland J. Flath, is a United States citizen who has taken no steps to

renounce his citizenship.  All of Defendant's international travel at issue was undertaken using a

United States passport.  See Exhibit 3 (Passport).  Using his U.S. passport, Defendant traveled to

Belize from the United States on numerous occasions with his final trip occurring on July 9,

2006.

### A.      The Initial Complaint

On June 14, 2010, the owner of a restaurant contained within the Copper Bank Inn in

Copper Bank Village, district of Corozal, in the country of  Belize, contacted the U.S. Embassy

point of contact in Corozal, Belize and stated that she had a video of an American national

molesting a minor child.  The U.S. Embassy in Corozal then provided the information to the U.S.

Embassy's Consular Services in Belmopan, Belize who contacted the complainant.  During this

conversation, the complainant indicated that she possessed a USB drive containing incriminating

information about an American, defendant Roland Flath.  The complainant advised that the

manager of the Inn had discovered the USB drive that contained images of child pornography, as

well as a video of defendant fondling the breasts of Minor A, who was then a 14 year old girl in

Copper Bank Village.  The manager had discovered this thumb drive while cleaning a room that

the defendant occupied at the Inn.  Upon viewing the video, the manager immediately

2

recognized the adult male to be Roland J. Flath, a citizen of the United States, and the local girl

to be Minor A. The complainant indicated that she recognized the perpetrator on the video to be

defendant Roland Flath as she had been acquainted with him for the past 15 years.

The Consular Officer forwarded the complainant's statement to the U.S. State

Department Diplomatic Security Service Regional Security Office (RSO) and the U.S. State

Department Diplomatic Security Service (DSS) responded by sending Investigator Garcia to

meet with the complainant and review the thumbdrive. On June 14, 2010, Investigator Garcia

met with the complainant. At that time, the complainant and the Inn manager who had

discovered the USB drive, used the laptop to show the investigator the contents of the USB.

Investigator Garcia confirmed that the USB contained a video of a minor girl's bare breasts

being fondled by an adult Caucasian male as well as the existence of other minor children

engaging in sex acts with adults. The complainant informed him that she recognized the girl in

the video to be Minor A, a fourteen year old girl residing in Copper Bank Village, and the adult

male fondling her to be the defendant. According to the complainant, defendant would regularly

come to the Copper Bank Inn to use the computer and the Internet in his room. Generally

defendant would enter the inn sometime between around 2:00 - 3:00 a.m., use the computer and

internet, and then leave at approximately 6:00 a.m. before anyone else woke up.[1] The

complainant then provided the USB drive to the investigator.

The following day, Assistant Regional Security Officer ARSO Trachtenberg traveled to

Corozal to provide assistance to Investigator Garcia. Investigator Garcia called Inspector James

---

[1] Investigation revealed that in addition to defendant's house, defendant occupied a room
at the Copper Bank Inn where he would use the computer and Internet.

3

Moreira, the second in command at the Belize Police Department (BPD) located in the town of

Corozal and requested a meeting.[2]  The investigators met with Inspector Moreira and provided

him with the USB, and indicated that the USB contained inappropriate activity with minor girls

which violated both the U.S. and Belize laws.  ARSO Trachtenberg further stated that the

evidence on the USB suggested the likelihood of the presence of additional electronic evidence

at the defendant's residence.  ARSO Trachtenberg stated that although he had an interest in a

possible U.S. prosecution, it would only be after the conclusion of any Belizean prosecution.

Inspector Moreira expressed interest in pursuing investigating a violation of the Belize law and

stated that he could likely move forward and obtain a search warrant.  The U.S. investigators and

Inspector Moreira thereafter proceeded in their respective vehicles to the Corozal BPD.

Investigator Garcia followed Inspector Moreira inside the police station while ARSO

Trachtenberg remained outside in his vehicle.

**B.**     **The Search in Belize**

Upon entering the police station, Inspector Moreira contacted the domestic violence unit

and requested their review of the USB thumb drive.  During the review of the USB thumb drive,

one of the female reviewing officers immediately recognized Minor A and was able to identify

her by name and face.  Inspector Moreira also viewed the contents of the USB thumb drive and

after viewing commented that the contents looked very bad.  He then recommended obtaining a

search warrant and initiated an investigation into possible crimes of sexual assault.  Inspector

Moreira then compiled an investigation team so that they could obtain a search warrant, and

---

[2]  Copper Bank Village is a village within the district of Corozal.  The BPD for the
district of Corozal is located in the town of Corozal.

4

execute the warrant at the defendant's residence. Police Constable Ek and Crime Technician Moh were asked to join him. Constable Ek filled out the search warrant request and then he accompanied by Inspector Moreira proceeded to obtain the warrant. They brought the warrant and thumb drive to Superintendent Guzman. Superintendent Miguel Guzman was informed that the USB thumb drive contained child pornography materials. Superintendent Guzman then viewed the contents of the thumb drive and issued the search warrant. See Exhibit 4 (Belize Search Warrant).

Inspector Moreira then gathered an investigative team, comprised of approximately seven BPD officers to execute the search warrant. Inspector Moreira asked Investigator Garcia whether the U.S. investigators would proceed to defendant's residence as well. Investigator Garcia expressed interest in going, and Inspector Moreira responded that it would not be problematic and also indicated a preference to have the U.S. Embassy present during the execution of the search warrant to ensure that the defendant would not later allege a violation of his rights by the BPD officers. That afternoon, the BPD investigation team left for Copper Bank Village and the U.S. investigators followed in a separate vehicle.

When the BPD reached defendant's residence, the BPD approached the front entrance of defendant's home, knocked on the door, and announced their presence. The U.S. investigators along with another BPD were at the back door. When the BPD knocked on the front door, the defendant responded by attempting to exit from the back door but was stopped by the officers waiting there. Defendant reentered his residence and opened the front door. The BPD officers at the front then entered, and proceeded to both show and read the search warrant to defendant.

Defendant and his then 20 year old girlfriend Vilma were present at the time of the

search. The BPD officers first began their search of the downstairs portion of the residence. While the BPD were conducting the search, Investigator Trachtenberg approached the defendant. Although the defendant was not under arrest, Investigator Trachtenberg advised him of his Miranda rights. Defendant waived his rights and agreed to speak with Investigator Trachtenberg. See Exhibit 1 (Advisement of Miranda Rights). Defendant stated that he lived with his wife, who was 20 years old, and his daughter Minor B, who was 16 years old at the time of the interview. Although the defendant stated that Minor B was his biological daughter, additional investigation revealed that Minor B was adopted, although the legality of the adoption is questionable. During the interview, the defendant admitted to downloading images of children performing sexual acts from the Internet, and to touching Minor A's breasts. Defendant signed a statement admitting to to the same. See Exhibit 2 (Signed statement). Investigator Trachtenberg then proceeded to show defendant some of the images printed from the USB thumb drive and asked whether he was planning to send these images to anyone else. At that point, the defendant invoked his Miranda rights and requested an attorney. At some point, to confirm the defendant's identity, ARSO Trachtenberg asked the defendant about his identification documents and after receiving the response, ARSO Trachtenberg provided the information to the BPD officers who were present.

The search was conducted in an orderly and methodical manner. Inspector Moreira directed the search and determined the areas to be searched and the items to be ultimately seized. Constable Ek and other BPD officers conducted the physical search of the areas directed to by Inspector Moreira. Defendant and/or Vilma were witnesses to the search and the items seized per the BPD protocol while executing a search warrant. When inspecting an item, the officers

6

would first show it to the defendant and/or Vilma and question them about the item. The officers replaced all the items which they ultimately did not seize and only moved the items which they were required to do to execute the search. All items seized from defendant's residence were turned over to Crime Scene Technician Moh to collect and inventory.

Both U.S. investigators were present while the BPD officers searched the downstairs of the residence, but neither participated in the search nor seized any items. They merely observed. When the BPD officers proceeded to search the upstairs of the residence, only Investigator Garcia proceeded upstairs while ARSO Trachtenberg remained downstairs. The same search and seizure procedure was employed upstairs. Again while upstairs, Investigator Garcia merely observed and did not participate in the search and seizure of items. After finishing the search upstairs, the BPD officers came downstairs and searched a storage room on the first floor that they had not previously searched. There they discovered numerous DVD/CD Roms and children's underwear. At the discovery of the child's underwear, the defendant stated that he did something wrong, but he wouldn't do it again, and volunteered information to the BPD officers about having a room at the Copper Bank Inn that they could search. The entire search lasted approximately an hour and a half to two hours.

After completing the search, based on defendant's proffered information about the room at the Inn, the BPD officers planned to go to the Inn. Inspector Moreira informed some officers to wait at the residence for defendant's adopted daughter, Minor B, to return from school. Approximately three officers, including Inspector Moreira, waited for Minor B outside the residence. The other four officers and Flath proceeded to drive to the Inn which was about 3/4 of a mile from the residence. Although Flath was neither handcuffed nor restrained during the

search of the residence, handcuffs for officer safety were placed on Flath during the car ride to the Inn.

The U.S. investigators followed the BPD officers' vehicle to the Inn. At the Copper Bank Inn, the BPD officers spoke to the restaurant owner (original complainant) and the Inn manager who first discovered the USB drive and indicated that the BPD officers would like to see defendant's room. The restaurant owner consented and indicated she would assist with whatever the BPD needed. The complainant then asked the Inn manager to lead the BPD officers to defendant's room. The Inn manager, defendant, and BPD officers then proceeded upstairs to the room while the U.S. investigators remained on the first floor with the original complainant. While upstairs, the BPD officers first searched defendant's room and seized the desk top computer there. They asked also to see the Inn manager's room, to which the Inn manager complied, and seized the laptop in the Inn manager's room. The search of defendant's room and the Inn manager's room lasted approximately fifteen minutes each.

The BPD officers then returned back to defendant's residence with the defendant in the vehicle. The U.S. investigators followed but did not enter the defendant's residence at that time but waited outside near their vehicle. Soon thereafter, the BPD officers left defendant's residence with defendant in their vehicle and proceeded to the BPD in Corozal.

Upon arrival at the BPD Corozal station, Crime Scene Technician Moh compiled the items seized from the defendant's residence and then proceeded to show the defendant which items were ultimately collected. The defendant at some point was placed in a holding cell. All evidence was seized by the BPD officers and remained in the BPD custody. Sometime later, the U.S. investigators requested permission to obtain copies of the seized electronic evidence.

8

Approximately a month later, sometime in mid-July, 2010, the BPD provided the U.S. investigators an opportunity to obtain a copy of the electronic evidence. The original evidence was returned to the BPD a few days later in July, 2010.

## C.    <u>Interview of Minor A</u>

Minor A was interviewed on June 16, 2010. During the interview, Minor A stated that she was 14 years old and that she first met defendant when she was approximately 9 or 10 years old after she became friends with Defendant's "adopted daughter" Minor B. Minor A stated that after becoming friends with Minor B, she visited the Flaths on a regular basis. Minor A stated that on one of the occasions, when she was approximately 10 years old, she visited defendant's residence. When she arrived at the residence only the defendant was at the residence. Defendant invited Minor A into the house and told her that he wanted to speak with her. Defendant proceeded to tell Minor A that she was pretty, getting older, and that she needed to know things. Defendant then proceeded to show her a book which contained pictures of adults engaging in sexual relations. Defendant then asked Minor A whether she wanted to try the things that were shown in the book, to which Minor A said no. Defendant responded by pushing Minor A onto the sofa. Minor A stated she became frightened and stood up. Defendant responded by hugging her and taking Minor A's blouse off. Minor A stated she became very frightened at this point and told the defendant that she would shout for help. Just at that time, a friend of Minor B came to the residence asking for Minor B. When the defendant turned to respond to the inquiry, Minor A put her blouse back on. Minor B's friend entered the residence for a bit. When Minor A finally left the defendant's residence to go home, he gave her $20 Belize dollars and told her not to tell anyone what he did to her.

9

Minor A stated that ever since she was 10 years old, she visited the defendant's residence approximately 30-35 times and that each time the defendant would take pictures or videos of her naked. Minor A also stated that during these times that she visited defendant, besides taking photos of her naked, he would also insert his fingers into her vagina and force her to conduct oral sex on him, or play with his penis. Defendant would generally pay her $10 or $20 Belize dollars after her visits. According to Minor A, if she refused to give defendant oral sex, the defendant would refuse to pay her. Minor A stated that she had to conduct oral sex on defendant for the money because her mother did not have food. After Minor A received the money, she would then buy food for her mother. Minor A informed her mother that she received money from the defendant for cleaning his house. Minor A stated that defendant was particularly interested in taking photos of her when she had her menstruation, and that he had instructed her to come see him during her menstruation cycle. She recalled that the defendant took photos of her naked in August, 2009, when she was menstruating. Minor A stated that she recalled this occasion specifically because it was close to the San Joaquin Fiesta time. On this occasion, defendant instructed Minor A to get on the bed, proceeded to take her clothes off, and then took photos of her vaginal area while she was continuing to menstruate. Minor A also that recalls going to defendant's residence at the end of January 2010 when she was menstruating. At that time, he unclothed her, took pictures of her naked, and then inserted one of his fingers inside her vagina until she informed him it hurt her. Minor A stated she last saw defendant in April, 2010, when he took photos of her naked in his kitchen area.

D.   **The Belize Charges**

On June 16, 2010, Flath was arrested by the Belize police, and on June 18, 2010 was

10

formally charged with two counts of aggravated assaulted for unlawfully committing an indecent

assault on Minor A who was under the age of 16.  <u>See</u> Exhibit 5 (Belize Charging Document).

Defendant was released pending the charges.  Defendant was scheduled to appear before the

Belize court in October 2010 on the pending Belize charges but failed to appear.  A bench

warrant was subsequently issued for defendant's arrest.  <u>See</u> Exhibit 6 (Order to Face Charges).

The case in Belize remains pending and ton defendant's reentry into Belize, defendant will be

detained to face these charges.  <u>Id.</u>  Defendant however failed to show and fled to Guatemala

sometime in October 2010.  On February 19, 2011, Guatemalan officials apprehended defendant

in Guatemala where defendant was illegally residing.  The RSO at the Belize U.S. Embassy

asked the U.S. Embassy in Guatemala to request that Guatemalan officials return defendant to

Belize to face Belize charges. The Guatemalan officials, however,  ultimately expulsed the

defendant to the United States as the defendant is a U.S. citizen.  The charges in Belize against

the defendant therefore remain pending.

E.      **Interview of Additional Victims**

        Further investigation of the defendant, and in particular interviews of two of defendant's

female relatives, who are now adults, revealed an extensive history of sexual abuse by the

defendant against both while they were children residing in Fond du Lac Wisconsin.  According

to these adult victims, defendant would often sleep in the same bed with them while they grew

up.  Similar to the way that defendant molested Minor A, Adult Victim #1 stated that she would

sometimes awake with Flath digitally penetrating her vagina with his fingers.  Adult Victim #1

stated that defendant sexually abused her in this manner until she was in the second grade.  Adult

Victim #2 stated that she recalled the defendant starting to sexually abuse her when she believes

she was three years old and continued until she was approximately thirteen years old.

**F.     Border Crossings**

The most immediate crossings for Flath shows that he last entered the United States on May 12, 2006, on Continental Airlines from Belize to Chicago connecting through Houston and that he left Chicago for Belize connecting through Houston on July 9, 2006. Flath also entered the United States through the Chicago airport from Juarez Mexico on Mexico Airlines on August 24, 2005, and flew back into Juarez Mexico on November 6, 2005.

**G.     The U.S. Search Warrant and Forensic Analysis**

The U.S. Embassy sent copies of the electronic evidence to the attention of Special Agent Neil O'Callaghan of Homeland Security Investigations/Immigration and Customs Enforcement in Washington D.C. for further examination. On September 14, 2010, Special Agent O'Callaghan applied for and received a search warrant to search the contents of the electronic media seized from the defendant from the magistrate court in the District of Columbia. <u>See</u> Exhibit 7 (District of Columbia Search Warrant). The particular media listed in the search warrant included one Western Digital hard drive, serial number WMAN9KR96125, forty-three DVD/CD-ROM discs, and one Kingston Thumbdrive. Upon receipt of the signed search warrant, SA O'Callaghan provided the media to the computer forensics specialist located in the Child Exploitation and Obscenity Section at the U.S. Department of Justice for further analysis.

A forensic examination of the hard drive and DVDs revealed approximately 15-20 suspected child pornography images of Minor A. In addition, sexually graphic videos were recoverd of what appeared to be Minor A fondling her own breasts, fondling a man's penis, performing oral sex, sitting naked spread eagle with the focal point of the camera on her vaginal

12

area, of the defendant stripping Minor A and fondling her breasts.  In addition to the images of

Minor A, the electronic media seized from defendant's residence contained other images of

suspected child pornography.

### III.  18 U.S.C. § 2423(c) IS CONSTITUTIONAL

Title 18, United States Code, Section 2423(c), included in the Prosecutorial Remedies

and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), 117

Stat. 650, extends the reach of "sex tourism" statutes to criminalize acts taking place entirely

outside of the United States. Section 2423(c), entitled "Engaging in illicit sexual conduct in

foreign places," allows for the prosecution of "[a]ny United States citizen or alien admitted for

permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct

with another person."  The phrase "illicit sexual conduct" is further defined in Section 2423(f) to

include a sex act with a person under 18 years of age that would be illegal under chapter 109A

(if

the act took place in the special maritime or territorial jurisdiction of the United States) or a

commercial sex act (as defined in 18 U.S.C. § 1591) with a person under 18 years of age.

Acts of Congress are presumed to be constitutional.  See, e.g., Munn v. Illinois, 94 U.S.

113, 124 (1876) ("Every statute is presumed to be constitutional").  Courts must exercise caution

and reluctance before striking down a statute.  See Parker v. Levy, 417 U.S. 733, 760 (1974)

(holding that courts must be "reluctant[ ] to strike down a statute on its face where there [are] a

substantial number of situations to which it might validly be applied"); Erznoznik v. City of

Jacksonville, 422 U.S. 205, 216 (1975) (emphasizing caution before striking down state statute

as facially unconstitutional); United States v. Morrison, 529 U.S. 598, 607 (2000) ("Due respect

13

for the decisions of a coordinate branch of Government demands [a court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds"). Accordingly, "[t]he courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained." Munn, 94 U.S. at 124. A facial challenge to a statute, such as that made by the Defendant, is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987); see also United States v. Ballinger, 395 F.3d 1218, 1225 n.2 (11th Cir. 2005) (en banc) (quoting Salerno, 481 U.S. at 745).

Defendant argues that the indictment should be dismissed because in enacting section 2423(c), Congress exceeded its' power to regulate foreign commerce and violated international law is without merit and should be denied. The Defendant has failed to show that there is no set of circumstances under which 18 U.S.C. § 2423(c) would be valid. His facial challenge to the statute therefore fails. Moreover, any challenge to the indictment as unconstitutional as applied to him as discussed infra also fails, as only U.S. citizenship, not residency, as defendant claims is required to fall under the jurisdiction of Section 2423(c). Furthermore, the defendant fails to cite to any binding or persuasive legal authority to support his allegation. Rather defendant's sole legal cites are to cases in the Ninth and Third Circuit which ultimately upheld the constitutionality of Section 2423(c) under the Foreign Commerce Clause. Defendant asks this Court not to follow the majority opinion, and hence the existing persuasive authority of the

14

courts who have actually addressed this issue, but rather the dissent.[3]  (Def's Motion to Dismiss at pp.4-5).

Furthermore, the defendant's argument that Section 2423(c) violates international law as unreasonable is not supported in any respect.  In fact, as discussed further infra, the few cases addressing reasonableness of Section 2423(c) under international law have all found the statute to be reasonable.  The existing cases addressing Congressional authority to enact Section 2423(c), as well as the legislative history of Section 2423(c), support the constitutionality of and Congressional authority to enact Section 2423(c).  Defendant's motion should be denied.

A.      **Congress Has Proper Authority to Enact 2423(c)**

Congress has the authority to enact laws that extend beyond the territorial boundaries of the United States.  See, e.g., EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991)("Aramco") (superceded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, § 109(c), 105 Stat. 1071, 1078 (1991)) (citing Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284-285(1949)); see also United States v. Plummer, 221 F.3d 1298, 1304 (11th Cir. 2000) ("Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States") (citation omitted); United States v. Baker, 609 F.2d 134, 136 (5th Cir. 1980) ("Since an early date, it has been recognized that Congress may attach extraterritorial effect to its penal enactments").  As stated by the Supreme Court in Aramco, "whether Congress has in fact exercised that authority in these cases is a matter of statutory construction."  499 U.S. at 248.  Legislation is generally presumed to apply only within the territorial jurisdiction of the

_____

    [3]  Part III.B infra of this Response briefly addresses why the dissent's concern in Clark is untenable.

15

United States "unless a contrary intent appears." Id. See also Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173 (1993).

"There is no constitutional bar to the extraterritorial application of penal laws . . . Numerous decisions have upheld the authority of the United States to enact and enforce criminal laws with extraterritorial effect." United States v. King, 552 F.2d 833, 850-51 (9th Cir.1976) (citing United States v. Blackmer, 284 U.S. 421, 436-38 (1932)). Notably, Congress has enacted numerous legislation with clear extraterritorial reach on conduct occurring exclusively on foreign territory that have been found to be constitutional and within Congress's power. See e.g., United States v. Clark, 435 F.3d 1100 (9th Cir. 2006) (upholding the constitutionality of and Congressional authority to enact 18 U.S.C. § 2423(c) which criminalizes certain conduct occurring exclusively on foreign territory); United States v. Emmanuel, No. 06-20758-CR, 2007 WL 2002452 (S.D. Fla. July 5, 2007) (unpublished) (upholding the constitutionality of and Congressional authority to enact Torture Act, codified at 18 U.S.C. § 2340A, where "the locus of the offense is completely foreign"); United States v. Williams, 722 F. Supp. 2d 1313, 1319 (M.D. Ga. 2010) (finding the Military Extraterritorial Jurisdiction Act to be a proper application of Congress's extraterritorial power); United States v. White, 51 F. Supp. 2d 1008 (E.D. Ca. 1997) (upholding Congressional authority to enact 18 U.S.C. § 1119 under which defendant was charged for murder occurring solely on foreign territory); see also Chua Han Mow v. United States, 730 F.2d 1308, 1311 (9th Cir. 1984) (rejecting defendant's argument that the court lacked subject matter jurisdiction over him because all criminal acts were committed on foreign soil and finding that "[t]here is no constitutional bar to the extraterritorial application of penal laws").

**B.      Congress Intended for Section 2423(c) to Apply to Extraterritorial Acts**

16

In determining whether Congress intended to make a statute apply extraterritorially, it is proper to consider "all available evidence" about the reach of the statute, including its text, structure, and legislative history. <u>Sale</u>, 509 U.S. at 177. A statute may therefore apply to extraterritorial acts even if such intent is not made explicit by the text of the statute. That Congress intended for 18 U.S.C. § 2423(c) to apply extraterritorially is apparent on the face of the statute. Section 2423(c) is limited to travel in foreign commerce rather than also including travel in interstate commerce. In addition, Section 2423(c) is entitled "Engaging in illicit sexual conduct in foreign places." <u>See</u> <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of doubt' about the meaning of a statute") (internal citations omitted). Because there is no ambiguity that this statute applies to acts committed outside of the United States, the Court should conclude its analysis. <u>See</u> <u>Freytag v. Comm'r of Internal Revenue</u>, 501 U.S. 868, 873 (1991) ("When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances").

Even if Congressional intent to apply Section 2423(c) beyond the territorial borders of the United States is not plain from the face of the statute, such intent becomes clear upon consideration of "all available evidence," including structure and legislative history. This intent becomes especially clear when Section 2423(c) is read alongside Section 2423(b). Section 2423(b), which criminalizes, in part, travel in foreign commerce "for the purpose of engaging in illicit sexual activity," requires that the Government prove a direct connection between the travel in foreign commerce and the illicit sexual activity. Because criminal intent must be formed while the defendant is still in the United States, Section 2423(b) is not truly a statute with

17

extraterritorial application. By contrast, Section 2423(c) replaces the phrase "for the purpose of" with "and," thereby making the substantive criminal act engaging in illicit sexual conduct after having traveled in foreign commerce. The language of Section 2423(c) should be interpreted in a

manner that avoids making other provisions, such as Section 2423(b), redundant. See Freytag, 501 U.S. at 877 (noting that courts should avoid interpreting a statute so as to make another statute redundant); see also Ballinger, 395 F.3d at 1236 (where possible, statutes should be construed so that "no clause, sentence, or word shall be superfluous, void or insignificant") (internal citations omitted).

The legislative history of Section 2423(c), passed as part of the PROTECT Act, also shows the clear extraterritorial reach of this statute and that it was specifically enacted as a different statute than Section 2423(b). Congress passed the provision now contained in 18 U.S.C. § 2423(c) to address difficulties with then-existing 18 U.S.C. § 2423(b), which "requires the government to prove that the defendant traveled with the intent to engage in the illegal activity. Under this section [the new 2423(c)], the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Conf. Rep. 108-66, 108th Cong., 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686. The text, structure, and legislative history of Section 2423(c) all evidence Congressional intent for Section 2423(c) to apply to extraterritorial acts. See also United States v. Martinez, 599 F. Supp. 2d 784, 798 (W.D. TX. 2009) (Congress' inclusion of a "foreign commerce" provision as a nexus for prohibiting the criminal behavior shows its intent for extraterritorial application). Defendant's cite to the dissent in Clark for the proposition that Section 2423(c) is somehow inherently flawed

18

because it does not contain an intent requirement is therefore without merit. (Def's Motion to Dismiss at p.6.) Requiring criminal intent to violate Section 2423(c) would essentially transform the crime into a violation of Section 2423(b) and thus make it a superfluous statute. Indeed, defendant acknowledges this clear Congressional intent in enacting Section 2423(c) but argues that the Congress exceeded its power under the foreign commerce clause.

**C.**     **Congress Properly Enacted Section 2423 Under the Foreign Commerce Clause**

Congress also possessed the authority to enact Section 2423(c) under the foreign commerce clause. See U.S. Const. Art. I, § 8, cl. 3. ("Congress shall have Power ... To regulate Commerce with foreign Nations"). Foreign commerce is defined in 18 U.S.C. § 10 as "commerce with a foreign country." "Foreign commerce" is typically defined in judicial opinions as including commerce or travel between the United States and any other country. See, e.g., U.S. v. Weingarten, 632 F.3d 60, 70 (2d Cir. 2011) ("foreign commerce" as defined in 18 U.S.C. § 10 contemplates travel between the United States and a foreign country); United States v. Montford, 27 F.3d 137, 139-40 (5th Cir. 1994); United States v. Hersh, 297 F.3d 1233, 1245 (11th Cir. 2002), cert. denied, 537 U.S. 1217 (2003).

Congressional power under the foreign commerce clause should be assessed in light of Congress's sweeping powers to regulate the conduct of United States citizens overseas. This power must also be analyzed in light of the well-established proposition that there are fewer limits on Congressional power to regulate foreign commerce than on its power to regulate interstate commerce. See, e.g., United States v. Bredimus, 352 F.3d 200, 208 (5th Cir. 2003) ("[t]he Supreme Court has long held that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce") (citing Japan Line, Ltd. v. Los

19

<u>Angeles County</u>, 441 U.S. 434, 448 (1979)).  The broader nature of Congressional authority to regulate foreign commerce stems, in part, from the fact that foreign commerce is "pre-eminently a matter of national concern."  <u>Japan Line</u>, 441 U.S. at 448; <u>see also</u> <u>Clark</u>, 435 F.3d at 1103 ("This expansive latitude given to Congress over foreign commerce is sensible given that 'Congress' power to regulate interstate commerce may be restricted by considerations of federalism and state sovereignty,' whereas '[i]t has never been suggested that Congress' power to regulate foreign commerce could be so limited'") (citing <u>Japan Line</u>, 441 U.S. at 448).

Regulations such as Section 2423(c) should be accorded as much deference as possible by reviewing courts, because they do not implicate the concerns over powers reserved to the States that figured heavily in the Supreme Court's commerce clause jurisprudence.  Concern over the balance between state and federal power lies at the heart of jurisprudence discussing the limits of Congressional power under the commerce clause.  For example, in <u>N.L.R.B. v. Jones & Laughlin Steel Corp.</u>, the Supreme Court noted that "the scope of [the commerce] power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them ... would effectually obliterate the distinction between what is national and what is local."  301 U.S. 1, 27 (1937).  <u>See</u> <u>also</u> <u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995); <u>United States v. Morrison</u>, 529 U.S. 598, 608-09 (2000).

Section 2423(c) should also be assessed in light of the fact that it regulates economic activity, which "occupies the very core of Congress' commerce authority." " <u>United States v. Peters</u>, 403 F.3d 1263, 1273 (11th Cir. 2005) (citing <u>United States v. Olin Corp.</u>, 107

20

F.3d 1506, 1510 n. 4 (11th Cir. 1997)).  The definition of illicit sexual conduct contained in

Section 2423(f) includes a commercial sex act with a person under 18 years of age.  18 U.S.C. §

2423(f).  The statute also reaches noncommercial sexual acts with a person under 18 if such

conduct would violate Chapter 109A. Id.[4]  A commercial sex act is defined 18 U.S.C.

§1591(c)(1) as a sex act "on account of which anything of value is given to or received by any

person."  The statute that the Defendant claims is invalid on its face thus encompasses a whole

set of applications directly regulating economic activity, such as the commercial sex acts

involved in the instant case.  The Supreme Court's recent limitation of Congress's power to

legislate pursuant to the commerce clause in cases such as Morrison "casts no doubt" on statutes

that directly regulate economic activity.  Gonzales v. Raich, 545 U.S. 1, 26, 125 S.Ct. 2195,

2211 (2005).

        The Supreme Court has identified three categories of activity that Congress may regulate

under its commerce power. These are the "use of the channels of interstate commerce," the

"instrumentalities of interstate commerce, or persons or things in interstate commerce," and

activities that "substantially affect interstate commerce."  Lopez, 514 U.S. at  558 (citations

omitted); Morrison, 529 U.S. at 608-09.  The requirements set forth in Morrison for establishing

a sufficient nexus between interstate or foreign commerce and the activity regulated applies only

to the third category of commerce clause regulation, concerning activities that substantially

affect interstate commerce.  Morrison, 529 U.S. at 609; Bredimus, 352 F.3d at 206-07.

        As noted in Ballinger, 395 F.3d at 1231, the "in commerce" language typically signifies

_____

        [4]  This definition encompasses non-forcible sexual acts with a person less than sixteen
years of age and sex by force or threat with a person less than eighteen years of age.  See 18
U.S.C. §§ 2241-2243.

the first two <u>Lopez</u> categories, which are the channels and the instrumentalities of commerce. The "affecting commerce" language typically invokes the third <u>Lopez</u> category, which is the regulation of activities that substantially affect commerce. <u>Id.</u> The court in <u>Ballinger</u> cautioned that, in interpreting the intended reach of a statute, courts should not stray from the particularized meanings of these terms. <u>Id.</u> at 1233. Thus, a court could not interpret a statute containing the "in commerce" jurisdictional element to be satisfied by a showing that the activities in question affect commerce. <u>Id.</u> at 1232 (citing <u>United States v. Am. Building Maintenance Indus.</u>, 422 U.S. 271, 280 (1975)).

With regard to Section 2423(c), it is clear that the requirement that the defendant traveled in foreign commerce could not be met by showing that the defendant's activities affected foreign commerce. Courts need not be so constrained by the <u>Lopez</u> categories in determining whether a particular statute is within Congress's power under the commerce clause, however, as "it is often the case that more than one category will accommodate a given piece of legislation." <u>Peters</u>, 403 F.3d at 1271, n.1. The court in <u>Ballinger</u> also emphasized this distinction, noting that the "question of whether Congress has the constitutional authority to proscribe [a defendant's] conduct is entirely distinct from the question of whether the statutory language Congress employed actually reached that conduct." <u>Id.</u> The court further explained the difference between the interpretation of statutory jurisdictional elements and the assessment of jurisdictional power, explaining that an amendment removing language requiring interstate travel from the challenged statute "removed interstate travel only as a jurisdictional requisite, not as a jurisdictional ground." <u>Id.</u> at 1240 (emphasis in original). In the case presently before the Court, Congress possesses sufficient constitutional authority to enact Section 2423(c) under its power to

regulate the channels of foreign commerce or its power to regulate activities that substantially affect foreign commerce.

The definition of illicit sexual conduct contained in Section 2423(f) compels the conclusion that there are at least some cases in which Section 2423(c) constitutes a direct regulation of economic activity.  Also, although Section 2423(c) does not require that a defendant possess an illegal purpose at the time of travel, the statute encompasses cases where such intent is present. The defendant would seemingly have to concede that the application of Section 2423(c) would at least fall within Congress's commerce clause power under these narrow circumstances.  As discussed above, the Defendant's facial challenge to Section 2423(c) must therefore be denied.  <u>See</u>, <u>e.g.</u>, <u>Ballinger</u>, 395 F.3d at 1224, n. 2.

In the context of a challenge to Congressional authority under the commerce clause, Courts have also directed that where a statute contains a jurisdictional element, facial invalidation is improper.  <u>See</u> <u>Ballinger</u>, 395 F.3d at 1228, n. 5 (noting that, when a statute contains an express jurisdictional element, "courts can 'ensure, through case-by-case- inquiry,' that each application of the statute is constitutional, and thus the statute should not be struck down as being facially unconstitutional") (internal citations omitted); <u>United States v. Smith</u>, 263 F.3d 1270, 1273 (11th Cir. 2001) (asserting that the jurisdictional element of a statute "immunizes" that statute from a "facial constitutional attack").  Section 2423(c) contains the jurisdictional element that the defendant "travels in foreign commerce."[5]; <u>c.f.</u> <u>United States v.</u>

---

[5]  Under the citizenship theory discussed <u>infra</u>, the "United States citizen" element of Section 2423(c) can also be categorized as a jurisdictional element.

Strevell, 185 Fed. Appx. 841, 844, No. 05-10873, 2006 WL 1697529 (11th Cir. June 20. 2006) (finding that the district court had subject matter jurisdiction to convict defendant of an attempted violation of 18 U.S.C. § 2423(c) (unpublished)).  For this reason as well, the defendant's facial challenge must fail.

1.    **Analysis of Congress' Authority to Enact Section 2423(c) under the Foreign Commerce Clause Does Not Require Strict Adherence to the Lopez Standards.**

The constitutionality of Section 2423(c) was upheld by a district court in United States v. Clark, 315 F. Supp. 2d 1127 (W.D. Wa. 2004) and then later on appeal by the Ninth Circuit.  See United States v. Clark, 435 F.3d 1100, 1103 (9th Cir. 2006).  The court upheld the constitutionality of Section 2423(c) as applied to Clark who was permanently residing in Cambodia for five years before committing the offense for which he was charged.  See id. Specifically, the Ninth Circuit held that where "the defendant travels in foreign commerce to a foreign country and offers to pay a child to engage in sex acts, his conduct falls under the broad umbrella of foreign commerce and consequently within the congressional authority under the Foreign Commerce Clause."  Id. at 1103.

The district court in Clark rejected the defendant's claim that Section 2423(c) was beyond Congress's constitutional authority, finding that the statute was within Congress's power to regulate the channels of foreign commerce.  Clark, 315 F. Supp. 2d at 1133-34.  Because the court found that Section 2423(c) was a proper regulation of the channels of foreign commerce, it declined to decide whether it is also a permissible exercise of Congressional authority to regulate the instrumentalities of or activities that substantially affect foreign commerce.  Id. at 1133, n. 5. In reaching this holding, the court in Clark recognized the broader nature of Congressional

power to regulate foreign commerce, noting "[t]his Court has identified no instance in which the United States Supreme Court invalidated a criminal statute for exceeding the bounds of Congress's authority to regulate foreign commerce." 315 F. Supp. 2d at 1135. The Clark decision also emphasized that the regulation of foreign commerce does not implicate the federalism concerns that were the "principal motivating factor" for the Supreme Court's decisions limiting the commerce power in Lopez and Morrison. Id. at 1135-36.

The district court decision in Clark also highlights the international dimensions of the conduct addressed by Section 2423(c), explaining:

> [T]his statute addresses a problem of grave international consequences that does affect channels of foreign commerce. The exploitation of children by United States citizens, even when that exploitation occurs by those who travel outside of the United States, is considered by the President of the United States to be a significant problem that the United States has committed to address ... Government action in this area also clearly implicates foreign policy and public health concerns.

315 F. Supp. 2d at 1135.

On appeal, the Ninth Circuit upheld the constitutionality of Section 2423(c) finding that Congress did not go beyond its scope of power under the Foreign Commerce Clause in enacting Section 2423(c) and holding Section 2423(c) to be constitutional. Clark, 435 F.3d at 1102. The court found that "[i]n light of Congress's sweeping powers over foreign commerce, we conclude that Congress acted within its constitutional bounds in criminalizing commercial sex acts committed by U.S. citizens who travel abroad in foreign commerce." Clark, 435 F.3d at 1109. The court in a footnote noted that they focused on congressional authority under the Commerce Clause in their review of Section 2423(c). The court, however, also noted that given Supreme Court precedent requiring the courts to "uphold the statute absent a plain showing that it is

25

unconstitutional," "Congress's plenary authority over foreign affairs may also provide a sufficient basis for [upholding the constitutionality of] § 2423(c)." <u>Id.</u> at 1109 n.14. Where, as here, a statute regulates the activities of U.S. citizens overseas in an area touching the foreign relations priorities of the United States, courts should be particularly hesitant to declare such a statute to be unconstitutional.

While the Ninth Circuit, citing <u>Lopez,</u> noted that general application of the three-category framework to interstate commerce case, specifically (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce, the court did not apply these categories to Section 2423(c) in its analysis of the Foreign Commerce Clause finding the categories to be a guide rather than "a straightjacket" and finding that these categories were neither exclusive nor mandatory, nor required by the Supreme Court to be applied in relation to the Foreign Commerce Clause. <u>Clark</u>, 435 F.3d at 1116. The Ninth Circuit found the Foreign Commerce Clause to differ from the Interstate Commerce Clause on which <u>Lopez</u> is based because while the Interstate Commerce Clause may invoke concerns about balancing federalism and state sovereignty, the Foreign Commerce Clause do not implicate such considerations. <u>Id.</u> at 1113 ("Federalism and state sovereignty concerns do not restrict Congress's power over foreign commerce") (citing <u>Japan Line</u>, 441 U.S. at 448 n.13). Because the Foreign Commerce Clause originated with the purpose for uniform rules governing commercial relations with other nations, "the Supreme Court has read the Foreign Commerce Clause as granting Congress sweeping powers." <u>Clark</u>, 435 F.3d at 1113 (citing <u>Bd. of Trustees of Univ of Ill. v. United States</u>, 289 U.S. 48, 59 (1933)). Consequently the Supreme Court "has been unwavering in reading

26

Congress's power over foreign commerce broadly" and "has <u>never</u> struck down an act of Congress as exceeding its powers to regulate foreign commerce." <u>Clark</u>, 435 F.3d at 1113 (emphasis added).

In analyzing Congress' authority to enact Section 2423(c) under the Foreign Commerce Clause, the district court in <u>Martinez</u>, recognized that both the Fifth and Ninth Circuits have held that "when regulating foreign commerce, Congress's authority is not constrained by the three categories in the <u>Lopez</u>/<u>Morrison</u> framework." 599 F. Supp. 3d at 805. Indeed while "[t]he <u>Lopez</u>/<u>Morrison</u> framework [was] 'developed in response to the unique federalism concerns that define congressional authority in the interstate context'...'the principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce.'" <u>Id.</u> (citing <u>Clark</u>, 435 F.3d at 1103; <u>Bd. of Trustees of Univ of Ill.</u>, 289 U.S. at 57). Therefore, "any statute that would be granted constitutional deference when it regulates interstate commerce is accorded even greater deference when Congress is regulating foreign commerce." <u>Martinez</u>, 599 F. Supp. 3d at 805 (citing <u>Bredimus</u>, 352 F.3d at 208).

While the Ninth Circuit in upholding the constitutionality of Section 2423(c) in <u>Clark</u> found that the Supreme Court did not require the <u>Lopez</u> interstate commerce categories to be neither exclusive nor mandatory in relation to the Foreign Commerce Clause (<u>Clark</u>, 435 F.3d at 1116) should this court nonetheless strictly apply the <u>Lopez</u> categories, analysis would support that Section 2423(c) is both a proper regulation of and also substantially affects foreign commerce.

a.    **Section 2423(c) is a Valid Regulation of the Channels and Instrumentalities of Foreign Commerce**

The district court in <u>Clark</u> took note of cases upholding 18 U.S.C. § 1204(a), the

27

International Parental Kidnapping Crime Act ("IPKCA"). One of the cases cited by the court in Clark was United States v. Cummings, in which a panel of the Ninth Circuit Court of Appeals held that the retention portion of the IPKCA was within Congress's authority to regulate the channels of foreign commerce. 281 F.3d 1046, 1049 (9th Cir. 2002). The extraterritorial provision of the statute at issue in Cummings provides, in relevant part, for the punishment of whoever "retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). In explaining its holding, the court in Cummings noted that Congressional authority under the commerce clause includes the regulation of non-economic activities that "affect, impede, or utilize the channels of commerce" and that Congress's foreign commerce clause power is even broader than that related to interstate commerce. 281 F.3d at 1048-49.

The court in Cummings upheld the IPKCA on two basic theories. The first was that the child unlawfully retained outside the United States must necessarily have traveled in the channels

of foreign commerce to reach the country in which that child is retained. 281 F.3d at 1049. The court noted that "[t]he cessation of movement does not preclude Congress's reach if the person or goods traveled in the channels of foreign commerce." Id. at 1050. The second basis of Congressional authority identified by the court in Cummings was that the wrongful retention of a child outside of the United States creates an impediment to the use of the channels of foreign commerce, because the child "cannot freely use the channels to return." Id.

The IPKCA was also upheld in United States v. Shahani-Jahromi, 286 F. Supp. 2d 723 (E.D. Va. 2003), in which the defendant claimed that the retention portion of the IPKCA violated

his due process rights and was beyond Congress's power under the commerce clause. In holding that the IPKCA was within Congress's commerce power, the court in Shahani-Jahromi also emphasized that the federalism concern that was a "principal basis" for the Supreme Court's recent limitations on Congress's use of its commerce power was "strikingly absent from this case." Id. at 735. The court further noted that, while child custody is typically an area of state concern, it occurred in the "context of international kidnapping, a quintessentially international problem in need of a national response." Id. at 736 (citing Japan Line, 441 U.S. at 448).[6]

It is important to note that the International Parental Kidnapping statute at issue in Cummings and Shahani-Jahromi does not require that the child was wrongfully removed from the United States, but only that the child was wrongfully retained outside the United States. Therefore, while these decisions refer to the wrongful use or impediment to the use of channels of foreign commerce, they do not support the narrow scope of Congressional power urged by the Defendant in this case. The IPKCA cases illustrate that it is not necessary to show that a person traveled in the commerce with specific illegal intent to fall within Congressional authority to regulate foreign commerce. In fact, the wrongful retention abroad, or constructive prevention of the use of channels of foreign commerce, is more remotely connected to such channels than the actual use by defendants required by Section 2423(c). Defendants such as Flath are actively using the channels and instrumentalities of foreign commerce to travel from the United States

---

[6] In Shahani-Jahromi, the child had been voluntarily taken to Iran by her mother so that wrongful retention was not preceded by wrongful removal. 286 F.Supp.2d at 733. The court nevertheless held that the IPKCA's regulation of non-economic activity taking place outside the channels of commerce was aimed at removing an impediment to travel in foreign commerce and was thus a valid exercise of Congress's authority to regulate the channels of foreign commerce. Id. at 734.

Case 2:11-cr-00069-WCG   Filed 05/23/11   Page 29 of 53   Document 20

and places where they engage in illicit sexual conduct with minors. This is so whether or not

they are shown to have possessed the intent to engage in such acts at the outset of

their outbound travel. While the <u>Cummings</u> court in the IPKCA cases applied the interstate

commerce framework, it also noted that "Congress has 'broader power' in the foreign

commerce." <u>Clark</u>, 435 F.3d at 1116 (citing <u>Cummings</u>, 281 F.3d at 1049 n.1.).

**b.    Section 2423(c) is a Valid Regulation of Activities that Substantially Affect Foreign Commerce**

Section 2423(c) is also within Congress's power to regulate activities that substantially

affect foreign commerce. Like the other facets of its commerce power, Congress's authority to

reach activities that substantially affect foreign commerce should be assessed in light of its

greater power over foreign commerce, which as previously noted does not implicate the

federalism concerns dominant in cases such as <u>Lopez</u> and <u>Morrison</u>.

Courts should consider four general factors when analyzing whether regulated activity

"substantially affects" interstate commerce.[7] These factors are (1) whether the regulated activity

is commercial or economic in nature; (2) whether the statute contains an express jurisdictional

requirement; (3) whether the statute or its legislative history contains congressional findings

articulating the effect of the regulated activity on interstate commerce; and (4) whether the

activity's effect on commerce is direct, as opposed to attenuated. <u>See</u> <u>Morrison</u>, 529 U.S. at 610-

12.

Of these factors, the most important is whether a statute regulates commercial activity.

<u>See</u> <u>Raich</u>, 545 U.S. at 26 (the limitation in cases such as <u>Morrison</u> "casts no doubt" on statutes

---

[7]  It is not clear how the assessment of these factors would apply, if at all, to the assessment of a statute regulating foreign commerce.

that directly regulate economic activity); Peters, 403 F.3d at 1273 (noting that "laws

aimed directly at economic activity are most likely to satisfy the substantial effects test")

(internal quotations omitted). Section 2423(c) involves the regulation of economic activity in

two respects. It requires travel in foreign commerce, which, in the majority of cases, will be
done

via commercial means. It also prohibits commercial sexual activity with minors. Although

Section 2423(c) prohibits non-commercial sexual activity in some cases, the link to commerce is

nonetheless clear. Congress has drafted Section 2423(c) and (f) so that some applications will

directly regulate economic activity.[8] Even the non-commercial sexual activity has been found to

affect commerce nonetheless. See discussion infra Part III.C.2. Furthermore, the link between

the prohibited activity and the affect on foreign commerce is not attenuated where defendants

travel in foreign commerce and spend money derived from U.S. sources to pay for hotels and

even the sexual activity itself.

　　　While Section 2423(c) does not contain Congressional findings regarding the impact of

the regulated activity on foreign commerce, courts have recognized that "when the challenged

statute regulates activity that is plainly economic in nature, no jurisdictional hook or

congressional findings may be needed to demonstrate that Congress properly exercised its

commerce power." Smith, 403 F.3d 1263, 1273. See also Raich, 545 U.S. at 20-21.

　　　In Raich, the Court held that the Controlled Substances Act ("CSA") was within

Congress's power to regulate activities that substantially affect commerce even where applied to

---

[8] This fact also means that it would be improper to declare the statute facially invalid. As noted above, facial invalidation is also not appropriate where a statute contains an express jurisdictional element. See Smith, 263 F.3d at 1273.

Case 2:11-cr-00069-WCG    Filed 05/23/11    Page 31 of 53    Document 20

the intrastate growth of marijuana for personal medical consumption. 545 U.S. at 32. In reaching its holding, the Court in <u>Raich</u> distinguished the CSA from the statutes struck down in <u>Lopez</u> and <u>Morrison</u>, which "did not regulate economic activity." <u>Id.</u> at 25. <u>Raich</u> affirmed that Congress can regulate activity that is not itself commercial where such activity is part of a class of activities that is within the reach of federal power. <u>Id.</u> at 22-23. Such regulation of noncommercial, intrastate activity furthers the "federal interest in eliminating commercial transactions in the interstate market in their entirety." <u>Id.</u> at 19.

In assessing Congress's power to enact Section 2423(c) under these standards, it is clear that both the commercial and non-commercial activities covered by this Section further the federal interest in eliminating the international sexual exploitation of minors. Under <u>Raich</u> and other controlling precedent, courts assessing the scope of Congress's authority under the commerce clause "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." <u>Id.</u> at 22. Congress clearly had a rational basis for concluding that the activities of multiple United States citizens who travel overseas and engage in the commercial and non-commercial sexual exploitation of minors substantially affect foreign commerce. Section 2423(c) should therefore also be upheld under the "substantial affects" prong of Congress's commerce clause power.

> **2. Courts have Upheld the Validity of Both the Commercial and Non-commercial Definition of Illicit Sexual Conduct of Section 2423(c) Under Congress' Foreign Commerce Clause Authority.**

The Ninth Circuit in <u>Clark</u> found that Section 2423(c) in so far as it dealt with commercial sex acts met the rational nexus requirement to a constitutionally sufficient degree and did not

32

exceed its power "to regulate Commerce with foreign Nations." Clark, 435 F.3d at 1117. The

Clark court clearly established that Section 2423(c) insofar as it implicates the commercial sex

acts definition of 2423(f) does not exceed Congress' Foreign Commerce Clause authority. See

also Martinez, 599 F. Supp.2d at 807 (noting "a worldwide market exists for child prostitution, an

activity that is 'quintessentially economic' in nature, and that falls within foreign trade and

commerce"). Clark only discussed the constitutionality of Section 2423(c) in the context of

commercial sex acts and declined to address constitutionality where non commercial sex acts

were involved. Clark, 435 F.3d at 1110 n.16. Subsequent courts addressing Congress' ability to

enact Section 2423(c) in so far as it implicates the non-commercial definition of illicit sexual

conduct under Section 2423(f), have found that Congress had proper authority under the foreign

commerce clause .

The Third Circuit in United States v. Bianchi, 386 Fed. Appx. 156, No. 09-2664, 2010

WL 2650357 (3rd Cir. July 2, 2010) (unpublished opinion), in addressing the constitutionality of

Section 2423(c) first discussed the Ninth Circuit's holding in Clark holding Section 2423(c)

constitutional in respect to commercial illicit sexual conduct, and noted that in reaching it's

decision that "the Supreme Court 'has been unwavering in reading Congress's power over foreign

commerce broadly' and has never struck down a law as exceeding Congress's Foreign Commerce

Clause powers." Id. at 162. The Third Circuit then found that "[t]he Supreme Court's broad

interpretation of the Foreign Commerce Clause applies with equal force to the non-commercial

sexual conduct prong of § 2423(c)." Id. The court correctly noted defendant's burden to make a

"plain showing that Congress [] exceeded its constitutional bounds" in enacting the non-

commercial sexual conduct prong of § 2423(c) and that defendant did not even attempt to argue

that Congress did not have a " 'a rational basis for believing that failure to regulate the non-commercial sexual abuse of minors 'would leave a gaping hole' in the PROTECT Act and its ability to regulate the commercial industry of child prostitution.'" Id. (citing Morrison, 529 U.S. at 607; Martinez, 599 F. Supp. 2d at 808.

In United States v. Pendleton, No. 08-111-GMS, 2009 WL 330965 (D. Del. Feb. 11, 2009), the court found that 2423(c) and (f)(1) did not exceed Congress' authority under the foreign commerce clause. The court rejected defendant's argument that § 2423(f)(1) exceeds Congress' authority under the foreign commerce clause because it regulates non-commercial sexual acts, and found that the explicit statutory requirement of travel in foreign commerce, rather than the commercial nature of the sexual act, implicates Congress' authority to regulate and protect foreign commerce. Id. at *4. In so finding, the court found that the foreign travel "aspect of §§ 2423(c) and (f)(1)-not the commercial nature of the sexual act-that places the provisions at issue 'squarely within Congress' authority to regulate and protect' Foreign Commerce." Id. Therefore, the nature of the sex act itself as commercial need not be analyzed.

The Martinez court explicitly found that Congress had authority under the Foreign Commerce Clause to prohibit both the commercial and noncommercial illicit sexual conduct at issue in §§ 2423(c) and (f). As aptly stated by the court,

> [G]iven the almost complete deference federal courts have shown towards Congress in enacting laws regulating foreign commerce, the extensive powers that the Constitution affords Congress in regulating international affairs, and the unambiguous jurisdictional language in § 2423(c), this Court holds that Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations" when it made both the commercial and noncommercial illicit sexual conduct in § 2423(c) and §2423(f) unlawful.

599 F. Supp. 2d at 808. See also Bredimus, 352 F.3d at 208 ("[t]he Supreme Court has long held

34

that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce") (citing <u>Japan Line</u>, 441 U.S. at 448). In reaching it's holding, the court looked to the Supreme Court's reasoning in <u>Raich</u>, and found a rational basis for finding that "leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry" and thus leave "'a gaping hole' in the PROTECT Act." <u>Id.</u> (citing <u>Raich</u>, 545 U.S. at 22).

**D.      Section 2423(c) Does Not Violate International Law and is Not Unreasonable**.

Where Congressional intent to exercise extraterritorial jurisdiction of the subject offense is plain from the face of the statute, courts have noted generally that there is no need to analyze whether the statute comports with international law. <u>See</u> <u>United States v. Neil</u>, 312 F.3d 419, 422 (9th Cir. 2002). Because the extraterritorial reach of section 2423(c) is clear, and in fact has no clear application within the territorial bounds of the United States, it is not necessary for the Court to consider the more detailed factors used by courts to determine whether the extraterritorial application of a statute comports with international law. <u>See also</u> <u>United States v. Yousef</u>, 327 F.3d 56, 86 (2nd Cir. 2003) (where the court emphasized that Congress is "not bound by international law" in determining the reach of extraterritorial statutes, and that "if [Congress] chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law") (internal quotations omitted); <u>Fed. Trade Comm'n v. Campagnie de Saint-Gobain-Pont-a-Mousson</u>, 636 F.2d 1300, 1323 (D.C. Cir. 1980) (Courts of the United States are "obligated to give effect to an unambiguous exercise by the Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law"); <u>Pendleton</u>, 2009 WL 330965, at *5 ("the validity of the laws of the United

35

States do not depend on international law") (citing <u>Alvarez-Mendez v. Stock</u>, 941 F.2d 956, 963 (9th Cir. 1991)).

Nonetheless, where possible, the exercise of extraterritorial jurisdiction should comport with international law.  <u>See</u>, <u>e.g.</u>, <u>Plummer</u>, 221 F.3d at 1307; <u>Garcia-Mir v. Meese</u>, 788 F.2d 1446, 1453 (11th Cir. 1986) (citing <u>Murray v. The Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) 64 (1804)); <u>c.f.</u> <u>United States v. Vasquez-Velasco</u>, 15 F.3d 833, 839 (9th Cir. 1994) ("In determining whether a statute applies extraterritorially, we also presume that Congress does not intend to violate principles of international law.  Thus, in the absence of an *explicit Congressional directive,* courts do not give extraterritorial effect to any statute that violates principles of international law") (emphasis added).  A study of international law fully supports the exercise of jurisdiction under Section 2423(c).  As noted by the Defendant, international law recognizes the exercise of criminal jurisdiction by a nation under five general principles.  These include the territorial, national, protective, universality, and passive personality principles.  <u>See</u>, <u>e.g.</u>, <u>Rivard v. United States</u>, 375 F.2d 882, 885 (5th Cir. 1967).  Of these, territoriality and nationality are the most widely-accepted bases for the exercise of extraterritorial jurisdiction.  Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 402 cmt. a.

Section 2423(c)'s presumption of constitutionality under the law and Congress's clear intent for extraterritorial jurisdiction under section 2423(c) is sufficient for this court to exert jurisdiction in this case.  Nonetheless an analysis under international law supports that Section 2423(c) charge as applied to defendant Flath is consistent with the nationality principle of international law.  <u>See</u> <u>Chua Han Mow</u>, 730 F.2d at 1312 ("Extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority") (quoting

36

King, 552 F.2d at 850).

Under international law, nationality alone supports the exercise of extraterritorial jurisdiction. See United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir. 1977) (noting that "citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state") (citing Restatement (Second) of Foreign Relations Law of the United States (1965) § 30); Plummer, 221 F.3d at 1307 (finding jurisdiction over defendant under the nationality principle of international law, "which permits a state to exercise criminal jurisdiction over one of its nationals"); United States v. Columba-Colella, 604 F.2d 356, 358 (5th Cir. 1979) (recognizing that "a country may supervise and regulate the acts of its citizens both within and without its territory"); see also King, 552 F.2d at 850-52 (stating that there is "no constitutional bar to the extraterritorial application of penal laws" and suggesting that authority over United States citizens overseas is a source of Congressional legislative power); United States v. Walczak, 783 F.2d 852, 854-55 (9th Cir. 1986) (treating nationality principle as a sufficient basis for the exercise of subject matter jurisdiction).

The power of the United States to criminalize the extraterritorial acts of its nationals is inherent in sovereignty, and stands apart from powers enumerated in the Constitution. See Blackmer, 284 U.S. at 437. The Supreme Court has stated broadly that, while Congressional legislation is generally construed to apply only within the territorial jurisdiction of the United States unless a contrary intent appears, "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power." Id. That Congress has authority to enact statutes with extraterritorial reach over its citizens in foreign countries is not disputed. Rather, the determinative question is whether Congress chose

to exercise such authority in a statute.  See United States v. Cotten, 471 F.2d 744, 749 (9th Cir. 1973) (in discussing Congressional authority to enact statutes with extraterritorial reach, the court noted that "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power") (citing Blackmer, 284 U.S. at 437).

Even where courts have declined to apply extraterritorial jurisdiction to certain statutes, the bases for these decisions was one of Congressional intent rather than authority.  That is, although the court recognized Congress's authority to extend extraterritorial jurisdiction, analysis of the statute at issue did not evince such Congressional intent.  For example, in United States v. Mitchell, 553 F.2d 996 (5th Cir. 1977), the court explicitly recognized that Congress could have exercised authority over the acts of United States citizens in foreign territorial waters based on Congressional authority to control the conduct of American citizens overseas, but chose not to do so in enacting the statute at issue.  The court citing a number of Supreme Court precedent stated that "[t]he Supreme Court has held repeatedly that the legislative authority of the United States over its citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns."  Id. at 1001.  See also United States v. Gatlin, 216 F.3d 207, 211 (2nd Cir. 2000) (while the court construed the statute at issue there against extraterritorial jurisdiction, the court acknowledged the undisputed Congressional authority to regulate the conduct of its nationals outside the territorial boundaries of the United States and recognized "the issue in this case is one of congressional intent – that is, statutory construction – not of congressional power").

The benefits of United States citizenship also carry the obligation to follow applicable laws.  The defendant in United States v. White, 51 F. Supp. 2d 1008 (E.D. Ca. 1997), was a

38

United States citizen and civilian who was indicted under 18 U.S.C. § 1119 for the murder of her two year old American son while she was residing in Japan. Id. at 1010. Section 1119(b) provides that "[a] person who, being a national of the United States, kills ... a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113." The court there recognized that "[i]t is pellucid Congress possesses external sovereignty authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad." Id. at 1011. Further, the court upheld the nationality principle noting that "under international law, a nation may generally assert jurisdiction over its citizens." Id. at 1011 (citing United States v. Juda, 46 F.3d 961, 967 (9th Cir. 1995)); Cotten, 471 F.2d at 749-50 (Congress' authority to enact extraterritorial statute is both constitutionally and internationally permissible under the nationality and territorial principles of international law).

Numerous courts have discussed and affirmed the authority of Congress to apply criminal statutes to the activities of United States citizens overseas. These decisions indicate that the exercise of such jurisdiction comports with both international law and constitutional protections. While the contexts of these discussions vary, they generally indicate that citizenship alone is sufficient to justify the exercise of jurisdiction over United States citizens for acts committed overseas. See, e.g., United States v. Frank, 599 F.3d 1221 (11th Cir. 2010) (finding that the United States properly comported with international law under the nationality principle when it exercised jurisdiction over defendant who was a United States citizen where defendant exploited a child overseas in violation of 18 U.S.C. § 2251A); Mitchell, 553 F.2d at 1001 (noting that "citizenship alone is generally recognized as a relationship sufficient to justify the exercise of

Case 2:11-cr-00069-WCG   Filed 05/23/11   Page 39 of 53   Document 20

jurisdiction by a state."); United States v. Reeh, 780 F.2d 1541, 1543 n.2. (11th Cir. 1986) (stating that a state may punish the wrongful conduct of its citizens no matter where it takes place); Plummer, 221 F.3d at 1307 (noting that the nationality principle "permits a state to exercise criminal jurisdiction over one of its national... Plummer is concededly a United States citizen, and therefore exercising jurisdiction over him in this case is proper.") (internal citations omitted). See also United States v. Hill, 279 F.3d 731, 740 (9th Cir. 2002); United States v. Harvey, 2 F.3d 1318, 1329 (3rd Cir. 1993). Congress has clear authority to enact statutes with extraterritorial reach over its citizens. Defendant is a United States citizen and as such this court has jurisdiction under the well-established nationality principle of international law.

Finally, courts that have specifically addressed attacks on Section 2423(c) have found that it comports with international law. In Clark, the Ninth Circuit found that Section 2423(c) comported with international law, and that extraterritorial application of Section 2423(c) was properly applied to Clark through the nationality principle. 435 F.3d at 1106. Like the defendant in the instant case, Clark attempted to invalidate Section 2423(c) as unreasonable citing the Restatement (Third) of Foreign Relations Law of the United States. Id. at 1107. The court denied Clark's argument as specifically applied to him and found that such application was not unreasonable. Defendant in the instant case argues that Section 2423(c) as applied to him is unreasonable under international law because he was a permanent residence of Belize. While Clark did not raise this particular basis for his argument of unreasonableness per se, the Ninth Circuit reviewed the record which included Clark's residence in Cambodia for five years and found no support for his argument that Section 2423(c)'s application to him would be unreasonable under international law. Notably the defendant here fails to cite to any legal

40

authority to support his argument.  As the Clark court implicitly noted when it found no basis for Clark's argument after combing the record, residence in a foreign nation is not a basis for finding a statute to be unreasonable in its extraterritorial reach.  Id.

In Pendleton, the district court first found that "international law principles cannot override or otherwise invalidate" Congress' clear intent for enforcement of Section 2423(c) and (f)(1) against any "United States citizen...who travels in foreign commerce, and engages in any illicit sexual conduct."  2009 WL 330965, at *5.  Furthermore, the Pendleton court specifically analyzed Section 2423(c) in the context of international law principles of "reasonableness" under the Restatement, as defendant in this case raises, and found 2423(c) and (f)(1) to be valid.  Id. The court in fact found prosecution under 2423(c) and (f)(1) reasonable under international law where the foreign nation had already prosecuted and convicted defendant for essentially the same offense.  Id. at *6.

In Martinez, the court rejected defendant's assertion that extraterritorial application of Section 2423(c) violates principles of international law.  As a preliminary matter though, and as discussed above, the court first noted that "international law" had no cognizable authority in the national courts of the United States.  599 F. Supp. 2d at 799.  Notwithstanding the lack of authority of international law on the U.S. courts, the court nonetheless conducted its analysis and found that Section 2423(c) did not violate the principles of international law concerning the extraterritorial application of a statute, and found extraterritorial jurisdiction proper under several principles including the defendant's U.S. citizenship.  Id. at 800 ("As stated previously, citizenship alone grants Congress the right to enact laws with extraterritorial application, thus authorizing jurisdiction under the 'national' principle) (citing Mitchell, 553 F.2d at 1001).

41

The court in Martinez also addressed defendant's claim that application of 2423(c) is unreasonable under international law. The Martinez court noted that as a preliminary matter, the lack of legal precedent requiring a "not unreasonable" inquiry in order determine the extraterritorial application of a statute. 599 F. Supp. 2d at 801. As such, the Martinez court declined to apply it. Nevertheless, the court determined that even applying the "unreasonableness" standard as set forth in the Restatement to Section 2423(c), the court found that the Section 2423(c) was not unreasonable. Id.

Extraterritorial application of Section 2423(c) to the defendant is supported under the nationality principle in accordance with international law, and is not unreasonable.

**E.    Congressional Authority Based on Treaty Power**.

Congress's power to enact Section 2423(c) is also grounded in its authority to pass legislation to implement treaties entered into by the United States. It is well-established that Congress may enact laws implement treaties to which the United States is a party. See U.S. Const. Art. I, § 8, cl. 18; U.S. Const. Art. II, § 2, cl. 2; Missouri v. Holland, 252 U.S. 416, 432 (1920). Laws made in pursuance of treaties entered into by the United States are the supreme law of the land, and are subject only to general constitutional constraints such as the protections provided by the Fifth Amendment to the Constitution. See, Missouri v. Holland, 252 U.S. at 433; Reid v. Covert, 354 U.S. 1, 17 (1957) (affirming that while treaties are a source of authority for legislation, the exercise of the treaty power must still observe constitutional prohibitions). The treaty power is thus a specific, enumerated source of authority for Congressional legislation. Section 2423(c) may be upheld as legislating the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography

42

(hereinafter "Protocol").  Protocol, opened for signature May 25, 2000, S. Treaty Doc. No. 106-37, UN Doc. A/RES/54/263, 2000 WL 33366017 (Exhibit 9).  The Protocol was ratified by the United States Senate on June 18, 2002.  See 148 Cong. Rec. S5717-01.  Belize became a party to the Protocol on January 1, 2004.  See Status of Ratifications of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography (Exhibit 10), available at www2.ohchr.org/english/bodies/docs/status.pdf (last visited May 9, 2011).

The preamble to the Protocol describes the States Parties as being "[d]eeply concerned at the widespread and continuing practice of sex tourism, to which children are especially vulnerable, as it directly promotes the sale of children, child prostitution and child pornography." The Protocol calls on States Parties to prohibit the sale of children, child prostitution and child pornography as provided for in the Protocol, and defines child prostitution as "the use of a child in sexual activities for remuneration or any other form of consideration."  Protocol, art. 2(b). Child pornography is defined as "any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primarily sexual purposes." Id., art. 2(c).

The Protocol specifically calls on States Party to establish jurisdiction for certain offenses covered by the Protocol, "whether such offences are committed domestically or transnationally or on an individual or organized basis." Protocol, art. 3. These offenses include "accepting ... a child for the purpose of [s]exual exploitation of the child," "obtaining ... a child for child prostitution," and "producing ... child pornography."  Id.  The Protocol further contemplates that such jurisdiction may be established "[w]hen the alleged offender is a national of that State or a person

43

who has his habitual residence in its territory." Id., art. 4.2(a).

The Protocol thus provides an explicit framework for extraterritorial jurisdiction over United States citizens who engage in sex tourism, and particularly commercial sex acts, while overseas. The Senate's ratification of the Protocol included the declaration that the provisions of the Protocol (other than Article 5) are non-self-executing and that "United States does not intend to enact new legislation to fulfill its obligations under the Protocol." See 148 Cong. Rec. S5717-01, *S5719. This does not, however, constrain future Congressional legislation implementing this multilateral agreement. In addition, courts may find that Congressional authority for certain legislation derives from the treaty power even where Congress has not specifically identified such legislation as implementing a treaty. See, e.g., United States v. Georgescu, 723 F. Supp. 912, 918 (E.D. N.Y. 1989) (finding that challenged statute could be "constitutionally justified" as within Congressional authority to implement certain conventions, even though Congress did not expressly indicate its treaty power as the constitutional basis).

Congress enacted section 2423(c) however to implement the Optional Protocol.

One of the statutes that Congress enacted to implement the Optional Protocol was § 2423, which was part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Act of 2003 (the "PROTECT Act"). Pub.L. 108-21, 117 Stat. 650 (2003)....As part of the House Conference Report accompanying the PROTECT Act, the House stated that its proposed modification to § 2423 "addresses a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors." H.R. Conf. Rep. 108-66, 108th Cong. 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686 (emphasis added).

Martinez, 599 F. Supp. 2d at 799; see also United States v. Frank, 486 F. Supp. 2d 1353, 1356-60 (S.D. Fla.2007) (discussing Optional Protocol, the PROTECT Act, and the extraterritorial effect of § 2423(c)). The Martinez court found 2423(c) to have extraterritorial effect "[g]iven that § 2423 was passed to enforce a multilateral treaty designed to protect children from transnational

44

and domestic child sex prostitution and 'sex tourism,' and given that the House Conference Report specifically mentions the statute's application to persons travelling in foreign countries." Id. See also Pendleton, 2009 WL 330965 at *4 (finding that Congress has authority to enact §§ 2423(c) and (f)(1) under its authority to implement treaties); Martinez, 599 F. Supp. 2d at 807 (nothing that § 2423(c) was designed to implement the Optional Protocol).

Section 2423(c) is independently supported by Congress's power to implement treaties to which the United States is a party and should be sustained on this basis as well.

**F.      Section 2423(c) is Within Congress's Constitutional Power as Applied to Defendant**

The Defendant's sole basis why Section 2423(c) is purportedly beyond Congressional power as applied to him is based on his allegation of his change of residence to Belize. Defendant's change of residence in this case is not a defense and does not render Section 2423(c) inapplicable to him.  As the foregoing discussion illustrates, Congress possesses broad authority to legislate in areas touching on foreign relations, particularly with regard to American citizens overseas.  See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315-16 (1936); Blackmer, 284 U.S. at 437.  Furthermore in United States v. Clark, the premier case involving prosecution under Section 2423(c) as defendant well acknowledges, the Ninth Circuit implicitly found that defendant's change of residence did not render Section 2423(c) inapplicable to him. See generally Clark, 435 F.3d at 1103.  Rather, the court found where the court found that defendant Clark's travel in foreign commerce and subsequent commercial illicit sexual conduct sufficiently fell under congressional authority under the Foreign Commerce Clause even though Clark had resided in foreign nation for five years.  Id.

In determining whether Congress exceeded its authority under the Foreign Commerce

Case 2:11-cr-00069-WCG   Filed 05/23/11   Page 45 of 53   Document 20

Clause by applying Section 2423(c) to defendant Clark, the Ninth Circuit just looked to see whether the defendant had (1) traveled in foreign commerce and (2) engaged in illicit sexual conduct with another person.  Id. at 1114-15.  In finding that Congress did not exceed it's authority in applying Section 2423(c) to Clark, the court noted that Clark had fulfilled the foreign commerce element by getting on a plan in the United States and traveling to Cambodia.  Id. at 1114.  Furthermore, the court found that the second element, the illicit sexual conduct, was met when Cambodia engage in a commercial sex act with a person under 18 years of age.  Id. at 1114-15.  The court found that both the travel in foreign commerce and commercial sex act with a minor implicated foreign commerce.  Id. at 1114.  Thus, the court found Section 2423(c) to be a valid exercise of Congress' Foreign Commerce Clause as applied to defendant Clark even though Clark had transferred residence to Cambodia.  Nowhere does Section 2423(c) preclude application to U.S. citizens with residencies in other countries.  Rather the statute confers jurisdiction to U.S. citizens who meet the other elements of the offense.  Defendant has failed to cite to any authority which states otherwise.

The defendant in Clark was a 71 year old U.S. citizen and military veteran, who primarily resided in Cambodia from 1998 until he was returned to the United States in 2003 and charged with violating Section 2423 based on his return travel from the United States to Cambodia in 2003.  435 F.3d at 1103.  While residing in Cambodia, Clark periodically returning to the United States for family visits, and also maintained real estate, bank accounts, investment accounts, a driver's license, and a mailing address in the United States.  Id. at 1103, 1129.

Notwithstanding the fact that Clark forecloses the argument that a change of residence to a foreign nation renders Section 2423(c) inapplicable, defendant Flath's general assertion that he

46

permanently left the United States 15 years ago to reside in Belize, Guatemala, and Nicaragua with periodic returns to the United States is not supported by any evidence. (Def's Mot. to Dismiss at p.2). Furthermore, the defendant does not provide any time frame for his presence in each country. Although it appears that the defendant has resided in both Belize and the United States at some point, it is unclear what period of time that has encompassed. What existing documents suggest, however, is that regardless of the basis for defendant's prior presence in Belize, he only acquired legal permanent residence in Belize on April 27, 2006, just months before the time frame alleged in the Indictment. <u>See</u> Exhibit 3 (Passport).[9] Furthermore, regardless of the length of time that the defendant maintained a physical residence in Belize, the defendant maintained his home in Fond du Lac Wisconsin until it was sold in June 30, 2006. <u>See</u> Exhibit 10 (Warranty Deed). Defendant then traveled to Belize on July 9, 2006.

During the entire time period alleged in the indictment, and indeed before the dates in the indictment, and to this day, defendant has kept his U.S. citizenship and per the benefits of his citizenship traveled in foreign commerce using his U.S. passport. But for defendant's U.S. passport, which declared him to be a citizen of the United States along, with all the privileges which come with U.S. citizenship, and permitted his access to other countries, the defendant would not have been able to leave the United States, legally travel in foreign commerce, and legally enter other foreign nations. Indeed, the defendant's U.S. citizenship facilitated his travel to Belize. Furthermore, while the defendant maintained a residence in Belize since 2006, he continued to maintain a bank account through this very day at the Fond du Lac Credit Union in

---

[9] Defendant's passport indicates that it was issued by the United States Government in 2007. However, the Belize permanent residency stamp is dated April 27, 2006.

47

Wisconsin with a mailing address in Fond du Lac, Wisconsin, up through 2006, and then thereafter at an address in San Diego, California.[10]  During the relevant time period, Defendant continued to receive social security benefits from the United States Social Security Administration with his listed address of Fond Du Lac Wisconsin.  See Exhibit 11 (Social Security Correspondences).  Furthermore, a review of defendant's bank records show that he was receiving a monthly pension (a taxable source of U.S. income) from Giddings and Lewis, his prior employer in Fond du Lac, Wisconsin during the relevant time period.

Review of the defendant's bank records support that he withdrew funds from his Fond du Lac bank account when he was present in Belize.  Thus, money that the defendant acquired in the United States were expended in foreign commerce when he withdrew and spent those very funds in Belize.

In addition to maintaining a bank account in Fond du Lac, Wisconsin, the defendant also maintained a valid Wisconsin driver's license which listed his Fond du Lac address as his place of residence valid through December 15, 2007, which overlaps with the dates charged in the Indictment.  See Exhibit 12 (Wisconsin driver's license).  The information contained on the defendant's driver's license goes against his assertion that he permanently left the United States 15 years ago.  The Wisconsin driver's license was issued on August 31, 2005, which is well within a 15 year time frame.  Id.  Indeed, defendant's assertion of his residency is which allowed him to legally obtain his license.  Furthermore, based on correspondence from Social Security, it appears that defendant continued to file federal income tax returns using his Fond du Lac address.

_____

[10]  These particular records were obtained through the use of grand jury subpoenas and therefore can not be made public.  The Government can provide these records for review for *in camera* for this court if so ordered.

<u>See</u> Exhibit 11 (Social Security Correspondences).  There is no evidence that defendant was working in Belize and by his own statements it appeared that he was retired.  Therefore, all the money spent by the defendant in Belize appeared to have been earned in the United States, and therefore provided the defendant with the economic means to reside in Belize.  Defendant has clear economic ties to the United States.

In light of the Ninth Circuit's holding in <u>Clark</u>, the defendant here can not claim that Section 2423(c) is unconstitutional as applied to him simply because he was no longer permanently residing in the United States.  <u>C.f.</u> <u>Clark</u>, 435 F.3d at 1108 n.12 ("Although Clark's citizenship alone is sufficient to satisfy Due Process concerns, his U.S. investments, ongoing receipt of federal retirement benefits and use of U.S. military flights also underscore his multiple and continuing ties with this country").  Given the defendant's continued use of his Fond du Lac address as his residence at best it appears that defendant maintained two residences, and in any event was using his Fond du Lac residence as his primary residence until he sold it in July, 2006.

Notwithstanding defendant's clear ties, including economic ties, to the United States, it is his alleged engagement in sexual activity specifically prohibited by a statute that applied to him by virtue of his citizenship that subjects him to jurisdiction under Section 2423(c).  This conduct however also falls within the express terms of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography, which is a multilateral treaty ratified by the United States.  The Protocol specifically recognizes the power of States Party to exercise extraterritorial jurisdiction over certain acts contained therein, including the use of a child in sexual activities for remuneration or any other form of consideration and child pornography.  <u>See</u> <u>generally</u> Exhibit 8 (Protocol).

49

Section 2423(c), as applied to defendant, is within Congress's broad authority under the foreign commerce clause. This statute is also within Congressional authority to regulate the channels and instrumentalities of foreign commerce, which is not limited to use of such channels with intent to engage in criminal acts. Under Ballinger and other cases interpreting this power, Congress can regulate the use of the channels and instrumentalities of commerce to facilitate prohibited acts. There is no doubt that where, as here, a defendant travels from the United States to a foreign country and engages in illicit sexual activity in that foreign country he is using the channels and instrumentalities of foreign commerce to facilitate his illegal activity.

The Statute, as applied, is also within Congressional authority to regulate activity that substantially affects foreign commerce. The Court in Raich affirmed that Congress can regulate activity that is not itself commercial where such activity is part of a class of activities that substantially affect commerce. Id. at 2206-07. The Court further emphasized that in such situations courts have "no power 'to excise, as trivial, individual instances' of the class." Id. at 2209 (internal quotations omitted). Cases support that foreign commerce is affected under both the commercial and noncommercial definition of illicit sexual conduct. See supra Part III.C.2. Minor A's statements support that she was often paid when defendant sexually abused her and that defendant had on one occasion informed her that he would not give her any money if she did not perform oral sex on him. Defendant's activities were also economic in other respects, in that he took a commercial airline to fly to Belize during the relevant time period. As noted elsewhere, the Defendant also used American funding sources to finance his travel and expenses while in Belize during the time period in which he allegedly engaged in illicit sexual conduct. The Defendant's activities fall squarely within a class of activities that substantially affect foreign

50

commerce. The Defendant's motion to dismiss must therefore be denied.

**G.     An Evidentiary Hearing Is Not Required**

Defendant is not entitled to an evidentiary hearing under the local rules nor is it necessary on a purely legal motion challenging the constitutionality of a statute. Defendant's request for an evidentiary hearing appears to mainly be for the purpose of contesting his ties to the United States which is not a factor in determining the applicability of Section 2423(c). The relevant law clearly only requires the defendant's United States citizenship to implicate jurisdiction under section 2423(c) for which an evidentiary hearing is not required especially as defendant does not contest his citizenship. Defendant's request for an evidentiary hearing should be denied.

**IV.  CONCLUSION**

Congress did not exceed it's authority under the foreign commerce clause when it enacted Section 2423(c). Notwithstanding the propriety of enactment under the foreign commere clause, Congress' authority to enact Section 2423(c) is also grounded in its authority to pass legislation to implement treaties entered into by the United States, as well as under the nationality principle of international law. Furthermore Section 2423(c) is reasonable under international law and in no way violates it. Finally, Section 2423(c) is also constitutional as applied specifically to the defendant. Defendant's motion should be denied in its entirety.

Dated this 23rd day of May, 2011, at Milwaukee, Wisconsin.

JAMES L. SANTELLE
United States Attorney


By:     s/ Mi Yung C. Park
Mi Yung Claire Park (CA bar 202379)
Trial Attorney - Child Exploitation and Obscenity

51

Section
1400 New York Ave., NW - Suite 600
Washington, D.C. 20005
(202) 616-2780; Fax: (202) 514-1793
miyung.park@usdoj.gov

s/Penelope L. Coblentz
Assistant United States Attorney
Penelope L. Coblentz Bar Number: 1006310
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: Penelope.Coblentz@usdoj.gov

53