UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                           Case No. 11-CR-69

ROLAND J. FLATH,

        Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO SUPPRESS**

The United States of America, by its attorneys, James L. Santelle, United States Attorney

for the Eastern District of Wisconsin, and Penelope L. Coblentz, Assistant United States Attorney,

for said district and Mi Yung Park, Trial Attorney, United States Department of Justice, Child

Exploitation and Obscenity Section, hereby respond to the defendant's supplemental brief to his

motion to suppress. For the reasons previously provided by the Government and as set forth below,

defendant's motion should be denied.

## I.  ARGUMENT

**A.**    **The Facts Support there Was No Joint Venture Because the United States
Did Not "Substantially Participate" in the Search of Defendant's Residence and
Defendant's Motion to Suppress Should be Denied**

Evidence obtained by foreign police officers from interviews or searches carried out in their

own countries is generally admissible in United States courts, regardless of whether the search

complied with Fourth Amendment or Fifth Amendment protections, even when American officials

were present and cooperated to some degree. United States v. Behety, 32 F.3d 503, 510 (11th Cir.

1

1994); Birdsell v. United States, 346 F.2d 775, 782 (5th Cir. 1965); United States v. Stokes, 710 F. Supp. 2d 689, 697 (N.D. Ill. 2009) (citing United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987)).

An exception to the general rule admitting evidence and statements obtained by foreign governments is "when the participation of United States agents in the investigation is so substantial that the action is a joint venture between the United States and foreign officials." Stokes, 710 F. Supp. 2d at 697 (citing United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995)). Whether the involvement of United States agents rises to the level of substantial participation is a fact-specific inquiry into the "facts surrounding the search." United States v. Marzano, 537 F.2d 257, 270 (7th Cir. 1976) (abrogated on other grounds) (citing United States v. Newton, 510 F.2d 1149, 1153 (7th Cir. 1975)).

    1.    <u>The Facts Surrounding the Search of Defendant's Residence Support that U.S. Investigators Neither Participated in the Search of the Residence Nor Seized Any Items</u>

The undisputed facts before this Court surrounding the search of defendant's residence here does not support that U.S. Investigators Trachtenberg and Garcia so substantially participated in the search of defendant's residence to implicate the joint venture doctrine.[1]

Investigator Garcia first confirmed a tip about an allegation of child molestation, and then provided the information and evidence to an official within the Belize Police Department ("BPD"). Garcia Decl. at ¶¶ 9-14. As discussed more extensively <u>infra</u>, providing initial information to a

_____

[1] Although it does not appear that the Seventh Circuit has explicitly recognized the "joint venture" doctrine per se, it has recognized that in certain circumstances involving foreign searches, where United States law enforcement officials substantially participated in the foreign search, or the foreign officials conducting the search or interrogation were acting as agents of the United States government, the Fourth Amendment will be implicated. See generally Marzano, 537 F.2d at 269.

foreign official does not constitute substantial participation.  See § I.A.2.  Defendant makes much

of the fact that the U.S. law enforcement expressed a possible U.S. prosecution after completion of

the Belizean prosecution.  Defendant's Supplemental Brief at 3-4.  The Seventh Circuit, however,

has found that the U.S. law enforcement clear expression of U.S. interest in an already open

investigation of defendant and the foreign law enforcement's intent to assist the U.S. law

enforcement interest in conducting a search was insufficient to convert the foreign agent's action

into a joint venture.  Marzano, 537 F.2d at 267-71.

Rather this Court should focus on the facts surrounding the actual search to determine the

extent of the U.S. investigators' participation.  Marzano, 537 F.2d at 270 ("Whether the Government

participated so as to render the search Government action must be determined by examining the facts

*surrounding* the search") (citing United States v. Newton, 510 F.2d 1149, 1153 (7th Cir. 1975))

(emphasis added).  The undisputed facts before this Court surrounding the search of defendant's

residence support the conclusion that the U.S. investigators did not substantially participate in the

foreign search to warrant the application of the joint venture doctrine.

Although Investigator Trachtenberg provided the USB thumb drive to Inspector Moreira and

shared information about some of its contents, Inspector Moreira conducted his own independent

investigation with his officers before deciding to obtain a search warrant.  Moreira Decl. at p.1

(Docket No. 36, Exh. 1); Garcia Decl. ¶ 17.  Inspector Moreira took possession of the flash drive,

traveled to the Corozal Police Station, where it was then inserted into the computer system at the

Corozal Police Station, and reviewed first by a member of the BPD Criminal Investigation Branch

and Domestic Violence Unit, and then later by Inspector Moreira.  Id.  Inspector Moreira personally

observed pornography pictures of a minor in Copper Bank, whose identity was confirmed by one

of the other reviewing officers.  Id.  Inspector Moreira also confirmed the remaining contents of the

flash drive, and commented that the contents looked very bad.  Id.  The facts show that only after first having his staff and himself review the contents of the USB, did Inspector Moreira decide to initiate an investigation and obtain a search warrant.  Id.

Inspector Moreira gathered a team of his officers, briefed them on the situation, and indicated his decision to obtain and execute a search warrant on Flath's residence in Copper Bank.  Moreira Decl. at p.1; Garcia Decl. ¶ 18.  Inspector Moreira contacted Police Constable (PC) Roy Ek and informed  that he would be the one to obtain the search warrant.  Moreira Decl. at p.1; Ek Decl. at p.1 (Docket No. 36. Exh. 2).  PC Ek was familiar with defendant Flath and could identify him, as defendant Flath had previously been arrested at the Corozal Police Station for a firearm offense.  Ek Decl. at p.1.  Inspector Moreira and PC Ricky Valencia accompanied PC Roy Ek to obtain the search warrant from Superintendent of Police, Miguel Guzman.  Moreira Supplemental Decl. ¶ 2 (Docket No. 45, Exh. 1).  There, Superintendent Guzman was presented with the search warrant and the USB thumb drive.  Moreira Supp. Decl. at ¶ 2.  Inspector Moreira advised Superintendent Guzman that "there were picture of the male suspect sexually assaulting a teenager" on the USB thumb drive.  Id.  Superintendent Guzman conducted an independent review of the contents of the flash drive in the presence of the officers, and then signed the search warrant for the search of defendant's residence.  Id.  Neither Investigators Trachtenberg or Garcia were present at the time the search warrant was obtained.  See generally Moreira Supp. Decl.; Trachtenberg Decl.; Garcia Decl.

After receiving the search warrant, Inspector Moreira gathered a team of Belize police officers and informed them that they had received the search warrant for the defendant's residence and that they would then proceed to execute that warrant.  Moreira Supp. Decl. ¶ 3.  The purpose of the search warrant of Flath's residence was to investigate a possible violation of the Belize law.

4

Id. at ¶ 4. When Inspector Moreira asked Investigator Garcia whether he and Investigator Trachtenberg would accompany the BPD officers to the search of the defendant's residence, Investigator Garcia indicated a U.S. interest in the defendant. Garcia Decl. ¶ 18. Inspector Moreira indicated that he would prefer that the U.S. Embassy investigators be present during the search so that defendant Flath, a United States citizen, would not later allege to the U.S. Embassy that the BPD officers had violated his rights. Id. The two U.S. investigators followed the five BPD officers to defendant's residence in a separate vehicle. Moreira Decl. at p.1; Trachtenberg Decl. ¶ 12. The BPD officers and U.S. investigators arrived at defendant's home in the afternoon, around 2:30 p.m. Moreira Decl. at p.1. The officers surrounded defendant's residence per standard Belizean operating procedure, with PC Ek at the front door. Id.; Ek Decl. at p.1. Investigator Garcia and Trachtenberg along with another BPD officer waited along the back door. Trachtenberg Decl. ¶ 13. PC Ek announced the BPD officers' presence by stating "This is the Police open the door," and then knocked on the front door. Ek Decl. at p.1. PC Ek did this repeatedly about three times on the front door before a second door located on the other side of the building opened. Id. Investigator Trachtenberg indicated that when PC Ek knocked on the front door, defendant opened the back door, where Investigator Trachtenberg was located, in an attempt to flee. Trachtenberg Decl. ¶ 13. Investigator Trachtenberg secured the defendant for officer safety and led him back inside. Id.

PC Ek upon noticed that the other door (and not the front door he was knocking on) opened and so went to that door, and then introduced himself to the defendant as Police Officer Roy Ek. Ek Decl. at p.1. PC Ek recognized the defendant based on Flath's prior arrest at the Corozal Police Station for a firearms violation. Id. PC Ek both showed and read the search warrant to the defendant. Id. Defendant permitted the officers into his residence and informed them that his common law companion was on the second floor of the building. Id. PC Ek introduced himself to

5

defendant's common law companion, Vilma Ramirez, and informed Flath that Flath was required to witness the search of the residence. Id. The search was conducted in both the presence of Flath and Ms. Ramirez. Id. Inspector Moreira was in charge of the search of the defendant's residence and assigned tasks to the Belize police officers. Moreira Supp. Decl. ¶ 5. Inspector Moreira directed the search, determined the areas to be searched, and the items to be inspected and returned, although the other BPD officers conducted the actual physical search of the areas. Garcia Decl. ¶ 23. Crime Scene Technician Moh seized the actual items and created an inventory. Garcia Decl. ¶ 24; Ek Decl. at p.1. The search of Flath's residence was led by Inspector Moreira and the Belize police officers and not the U.S. Embassy investigators. Moreira Supp. Decl. ¶ 5. Investigators Trachtenberg and Garcia were present during the search of Flath's residence, but neither participated in the search nor seized any of the items. Moreira Supp. Decl. ¶ 6; Garcia Decl. ¶ 30; Trachtenberg Decl. ¶ 21. Investigator Garcia observed the search of the upstairs and portions of the downstairs search of Flath's residence, but Investigator Trachtenberg only observed the search conducted downstairs. Garcia Decl. ¶ 23; Trachenberg Decl. ¶ 16.

BPD Officer Robateau discovered a digital camera and a memory card on top of a chest of drawers inside defendant's room on the second floor of the residence. Ek Decl. at p. 1. Officer Moh secured these items. Id. Officers Ek, Valencia, and Moh searched a wooden structure connected to the first floor of the residence, and found numerous CDs hidden inside an old washer, which Officer Moh seized and inventoried. Ek Decl. at p.1; Moh Decl. at p.1 (Docket No. 36, Exh. 3). These items seized from defendant's home were both discovered and seized by the BPD officers. Id. These undisputed facts show that only the BPD officers searched the rooms.

PC Ek showed these items to Flath who then stated, "I know I made a mistake one time but I am not doing it again." Ek Decl. at p.1. At that time, the defendant told PC Ek about his room at

6

the Copper Bank Inn and consented to the search of his room there. Ek Decl. at p.1. The BPD officers conducted a search of Flath's room located on the second floor of the Inn, and ultimately seized the defendant's computer, while the U.S. Embassy investigators waited in the public area on the first floor. Trachtenberg Decl. ¶ 20; Garcia Decl. ¶ 28; Ek Decl. At p.2; Moh Decl. at p. 1. The evidence seized remained in the custody of the BPD. Garcia Decl. ¶ 29; Trachtenberg Decl. ¶ 22.

The facts before the court support that the BPD officers were conducting their own investigation of Flath, and that U.S. investigators did not participate in the actual search or the seizure of the evidence.

<blockquote>

2.    <u>U.S. Law Enforcement Provision of Initial Information and Subsequent Observation of the Foreign Search is Not "Substantial Participation" to Implicate the "Joint Venture" Doctrine</u>

</blockquote>

"It is well-settled that providing information to foreign authorities does not transform a subsequent search by foreign officials into a joint venture." <u>United States v. Baboolal</u>, No. 05-CR-215, 2006 WL 1942357, at *3 (E.D. Wis. July 11, 2006) (unpublished) (citing <u>Behety</u>, 32 F.3d at 510. The Seventh Circuit and a district court in the Eastern District of Wisconsin have found that where U.S. law enforcement provide initial information to foreign law enforcement and then accompany foreign law enforcement to observe search, that level of participation does not constitute "substantial participation" to implicate Fourth Amendment protection. <u>See</u> <u>Marzano</u>, 537 F.2d at 269-70 (abrogated on other grounds) (the U.S. law enforcement's provision of information which instigated the foreign investigation and ultimately their presence at the search was not substantial enough as to transform it into a joint venture, despite the fact that the U.S. law enforcement clearly expressed their interest in an already open investigation in the United States against defendant); <u>Baboolal</u>, 2006 WL 1942357, at *1 (unpublished) (where the court found the facts did not support the existence of a joint venture even though U.S. law enforcement provided

Case 2:11-cr-00069-WCG   Filed 11/04/11   Page 7 of 27   Document 50

information to foreign authorities and a significant amount of the information contained in the affidavit supporting the foreign search warrant was provided by U.S. law enforcement).

Moreover, the Seventh Circuit has noted that even where foreign law enforcement intends to help U.S. law enforcement interest in subsequently conducting a search, that itself is insufficient to convert the foreign agent's action into a joint venture. Marzano, 537 F.2d at 271 ("[t]hat he [the foreign detective] might also have intended to help the United States is not a sufficient reason to treat his actions as those of United States agents").

Courts in the Eastern District of Wisconsin have looked to the legal authority of the Fifth and Eleventh Circuits for guidance on when U.S. law enforcement participation in a foreign search constitutes "substantial participation" to implicate Fourth Amendment protections. Baboolal, 2006 WL 1942357 (unpublished) (citing to Behety, 32 F.3d 503); United States v. Baboolal, No. 05-CR-215, 2006 WL 1674480, at *3 (E.D. Wis. June 16, 2006) (unpublished) (citing to United States v. Hawkins,, 455-56 (5th Cir. 1980), United States v. Heller, 625 F.2d 594 (5th Cir. 1980), and Birdsell, 346 F.2d at 782). The Fifth and Eleventh Circuit have also declined to find that U.S. law enforcement officers "substantially participated" in a foreign search to implicate Fourth Amendment protections where U.S. law enforcement provided the initial information starting the foreign investigation, were present to observe the foreign search, and in some circumstances even participated in the search. See Behety, 32 F.3d at 506-07 (U.S. law enforcement did not substantially participate in a foreign search to trigger the joint venture exception, even though there the United States first alerted the Guatemalans of the information which resulted in the execution of the search, was present during the search, and actually videotaped part of the search); Birdsell, 346 F.2d at 782 (Fourth Amendment does not apply even where U.S. law enforcement provided information which ultimately led to the arrest and search at issue, and even where FBI agent

8

searched one of the vehicles with the foreign police); <u>Hawkins</u>, 661 F.2d at 456 (Information provided by U.S. law enforcement to Panamanians about the drug activities of U.S. suspects in Panama which ultimately led to the execution of a search warrant, discovery of contraband and other evidence, did not rise to the level of sufficient participation to trigger the Fourth Amendment); <u>United States v. Rosenthal</u>, 793 F.2d 1214, 1231 (11th Cir. 1986) (U.S. agents presence during foreign search is not substantial participation to trigger the joint venture exception); <u>Heller</u>, 625 F.2d at 599-600 (lead from U.S. law enforcement officers to British which ultimately resulted in defendant's arrest did not constitute substantial participation for Fourth Amendment to apply).

The key then is not whether U.S. law enforcement participated in the search, but whether such participation was so substantial as to implicate Fourth Amendment protections. <u>See</u> <u>Behety</u>, 32 F.3d at 511 (although U.S. officers participated by videotaping the foreign search, their participation "did not constitute the level of participation this [joint venture] exception contemplates").

The facts submitted to this Court support the conclusion that, although the initial information about defendant was provided by the U.S. law enforcement to the BPD, the BPD opened its own independent investigation, conducted its own independent review of the evidence submitted, and only after confirmation of the evidence deciding to obtain a search warrant for defendant's residence. <u>See</u> discussion <u>supra</u> § I.A.1. The facts also support that after deciding to obtain a search warrant, the BPD officers, and not the U.S. investigators, presented the evidence and request to Superintendent Guzman to obtain a search warrant of defendant's residence, and that Superintendent Guzman only after conducting his own independent review of the evidence issued the warrant. <u>Id.</u>

All the facts support that while the U.S. investigators were present for the search of the

9

defendant's residence, neither one participated in the actual search of the residence nor the seizure of any of the items.  Id.  Indeed Investigator Trachtenberg only observed part of the search. Trachtenberg Decl. ¶ 16.  The detailed declarations of the BPD officers submitted in support of the Government's position confirm that they, and not the U.S. investigators, discovered and seized the physical evidence currently at issue before this court.  Indeed the declarations of the BPD officers support that while all the BPD officers participated in the search of the residence, only Crime Scene Technician Moh seized the items.  In light of the relevant cases and the facts of this case, the defendant can not claim that the BPD officers were acting as agents of the U.S. Government nor that the U.S. investigators' participation was so substantial to implicate the "joint venture" doctrine.

Moreover, although U.S. law enforcement received a copy of some of the electronic evidence, it was one month after the search had been conducted, and even then the U.S. was only allowed to access to some and not all the evidence.[2]  Hence, this request should not factor into whether the US agents so substantially participated in the search of Flath's residence to render it a joint venture because although U.S. investigators requested copies of the evidence there was no guaranty that it would be obtained, and indeed the U.S. only received copies of some but not all the electronic evidence, and about a month thereafter.  See Government's Response to Def's Motion to Suppress at 25-26 (Docket No. 22).

Notwithstanding the fact that only a copy of some of the evidence was provided

---

[2]  In July 2010 approximately one month after the completion of the search, the BPD permitted the U.S. Embassy to make copies of the hard drive, one thumb drive, one memory stick, and 45 DVDs/CDs, in response to their request for copies of the electronic evidence. Def's Exhibits in Support of Motion to Suppress (Docket No. 16, Exh. 2).  After charges were filed against the defendant in this Court, the original evidence was requested and provisionally provided to the United States by Belize in April 2011.  At that time the BPD provided additional evidence not previously provided, to include a total of 76 DVDs/CDs, a digital camera, and another memory stick.

approximately one month after the search, the Seven Circuit has found that local officials' voluntary provision to the U.S. Government, of evidence seized pursuant to a foreign search, is not a seizure within the meaning of the Fourth Amendment.  See Marzano, at 271.

Furthermore, the main intent of the search of defendant's home was to determine the existence of a violation of the Belize law.  Indeed such a violation was found, and defendant was charged in accordance with the laws and procedures of Belize.  Moreira Decl. at p. 2.  Defendant would have been currently facing Belize rather than U.S. charges but for the fact that he absconded and escaped to Guatemala.  Moreira Decl. at p. 2.  Upon the Guatemalans discovery of defendant's illegal presence in Guatemala, he was deported back to the United States because of his status as a U.S. citizen.  Moreira Decl. at p. 2.  Charges against defendant remain pending in Belize.  See Government's Response to Def's Motion to Suppress at 25-27 and accompanying exhibits.  Even if the BPD officers intended to help the U.S. when it conducted its search of defendant's residence, this does not convert the search into a joint venture.  Marzano, 537 F.2d at 271 (noting that even the foreign law enforcement's intent to assist the U.S. law enforcement interest in conducting a search is insufficient to convert the foreign agent's action into a joint venture).

The facts support that the U.S. investigators' participation in the search of defendant's residence was limited to providing the initial information and then observing the search.  These acts do not rise to the level of "substantial participation" to implicate the joint venture doctrine and defendant's motion to suppress should be denied on this basis.

      3.      <u>A U.S. Investigator's Interview of the Defendant Implicates His Fifth Amendment Right from Self-Incrimination and Not His Fourth Amendment Right from Unreasonable Searches and Seizures and Should Not be Considered to Determine Whether the U.S. Investigator Substantially Participated in the Search of Defendant's Residence</u>

In his argument that the U.S. law enforcement so substantially participated in the search of

his residence to implicate Fourth Amendment protection of the search, defendant asks this Court to consider Investigator's Trachtenberg's interview of the defendant at his home after providing him with his <u>Miranda</u> rights. Def. Supp. Brief at 5. Investigator Trachtenberg's interview of the defendant would only be relevant to a Motion to Suppress Statements which the defendant has not raised.

As noted in the Government's original response to the Defendant's Motion to Suppress evidence, a challenge to any statements made would require a separate analysis of protections under the Fifth Amendment Right against self-incrimination, rather than the Fourth Amendment's right against unreasonable searches and seizures. <u>See</u> Government's Response to Def's Motion to Suppress at 15 n.3. Because defendant has not moved to suppress defendant's statements, the fact that Investigator Trachtenberg briefly interviewed defendant is irrelevant to whether U.S. law enforcement substantially participated in the *search* of defendant's residence as to afford *Fourth* Amendment protections. Emphasis added. <u>See</u> <u>generally</u>, <u>Hawkins</u>, 661 F.2d at 455-56 (where the court analyzes defendant's joint venture argument in his motion to suppress only in the context of the foreign search even though U.S. agents interrogated defendants in Panama).

Notwithstanding the fact that a separate analysis is required when statements and not a search is at issue, defendant notably was advised of his <u>Miranda</u> rights which he initially waived and voluntarily provided a statement. <u>See</u> Trachtenberg Decl. ¶ 14; Advisement of Rights (Docket No. 19, Exh. 1); Signed Statement (Docket No. 19, Exh. 2). Thereafter, defendant invoked his right to remain silent, and the Investigator Trachtenberg stopped the interview. Trachtenberg Decl. ¶ 14. Courts conducting a joint venture analysis to determine the application of Fifth Amendment extraterritorially do not necessarily find that the occurrence of such an interview <u>de facto</u> warrants Fifth Amendment protections. <u>See</u> <u>Heller</u>, 625 F.2d at 599-600 (where the court found U.S. law

12

enforcement did not "substantially participate" even though they interviewed the defendant and provided the initial investigative lead to foreign authorities); <u>United States v. Kilday</u>, 481 F.2d 655, 656 (5th Cir. 1973) (where Fifth Amendment right did not apply even though defendant was arrested in Argentina in connection with a bank robbery that occurred in Florida, questioned by an Interpol agent rather than Argentine police, and a U.S. consular official was present and acted as an interpreter during the interrogation). Nonetheless, defendant was given Fifth Amendment protections through his <u>Miranda</u> rights which he ultimately invoked soon thereafter and the interview ceased.

Defendant's statements to Investigator Trachtenberg were afforded constitutional protection and is not a factor to be considered in determining whether U.S. law enforcement's substantially participated in the search and seizure of defendant's residence.

Defendant argues that because Crimes Scene Technician Moh labeled the investigation as "joint" at one point, this converts the foreign search into a joint venture exception to the Fourth Amendment's inapplicability to foreign searches. The "joint venture exception" is a term of art with legal significance that is only implicated when U.S. law enforcement so substantially participate in a search that the foreign law enforcement are acting as agents for the United States. Therefore, this Court needs to conduct this factual analysis of the U.S. investigators' participation in the search rather than a description by a foreign officer as "joint" in reaching its conclusion. <u>See e.g.</u>, <u>Baboolal</u>, 2006 WL 1942357, at *3, (no joint venture found even though search warrant was requested pursuant to the affiant's position in the "Toronto Strategic Partnership, a coalition of Canadian and American governmental agencies formed for the purpose of investigating deceptive telemarketing in or originating from the province of Ontario and cross-border" and the court had no doubt that the information obtained pursuant to the search warrant would likely be used by both

Canadian and American authorities).

**B.**  **Defendant's Motion to Suppress Evidence Seized from the Copper Bank Inn Should be Denied Based on Defendant's Consent and Because There Was No Joint Venture**

As the Government has previously noted in its earlier brief, the search of the defendant's room at the Copper Bank Inn was based on defendant's consent and not the search warrant. <u>See</u> Government's Response to Def's Motion to Suppress at 7, 23, and n.5 (Docket No. 22). The defendant in his previous filings to the court only attacks the search of his residence and not his room at the Copper Bank Inn. Moreover, even when addressed in the Government's original response, the defendant in his Reply Brief only asks this Court "to suppress all items seized pursuant to two search warrants – a warrant issued by the Corozal Judicial District in Belize for Flath's residence in Copper Bank Village, Belize; and a warrant issued by the United States District Court for the District of Columbia to search "electronic evidence" seized from Flath's residence in Belize." <u>See</u> Def's Consolidated Sur-Reply at 12-13 (Docket No. 25). At no point does Flath challenge his consent to the search of the Inn. In fact, it was defendant's voluntary statement to PC Ek about his room at the Inn which led to the subsequent search of that room. Ek Decl. at p. 2.

The undisputed facts before this Court support that the evidence seized from the Inn, defendant's hard drive, was based on defendant's consent, and therefore that evidence can not be suppressed based on the defendant's challenge of the legality of the Belize search warrant. This Court should deny the motion to suppress as it relates to the defendant's hard drive from the Inn without further analysis. <u>See</u> Ek Decl. at p.2.[3]

---

[3] Specifically, Police Constable Roy Ek in his declaration noted,

I then asked Mr. Roland Flath if he had any other house or room he was in charge of where he answered back to me that he had a room at copper bank Inn only one room he had access to as it Was been manage by other person. I then asked Mr.

14

Notwithstanding the undisputed fact of defendant's consent to search, should this Court nonetheless conduct a further analysis, the submitted declarations indicate that U.S. investigators neither participated nor even observed the search of defendant's room at the Inn. Therefore, the exception to the application of the Fourth Amendment to foreign searches is inapplicable and the court should apply the established rule that evidence obtained by foreign police officers from interviews or searches carried out in their own countries is generally admissible in United States courts, regardless of whether the search complied with Fourth Amendment or Fifth Amendment protections. See Stokes, 710 F. Supp. 2d at 697.

Although U.S. investigators Trachtenberg and Garcia traveled to the Copper Bank Inn, they traveled in a separate vehicle from the BPD officers and the defendant. Trachtenberg Decl. at ¶19; Garcia Decl. ¶ 27. Defendant's room was located upstairs. Trachtenberg Decl. at ¶20; Garcia Decl. ¶ 21. Investigators Trachtenberg and Garcia remained downstairs in the public section of the Inn to wait while the BPD officers conducted their search of defendant's room. Id. The facts support that Investigators Trachtenberg and Garcia did not participate in the search nor was even present to observe the search of defendant's room. Id. There was absolutely no participation by the U.S. investigators in the search of defendant's room at the Inn and defendant's motion to suppress evidence as it relates to evidence seized from the Inn should be denied.

**C.    The Search Satisfies the Fourth Amendment's Requirement of Reasonableness and Defendant's Motion to Suppress Foreign Evidence Should be Denied**

      1.    <u>The Warrant Requirement Does Not Apply to Foreign Searches and Therefore the Foreign Warrant Does Not Need to Be Supported by Probable Cause or a Neutral</u>

---

Roland Flath if he was willing to take us to that room where he volunteered and agreed to take me to the room.

Ek Decl. at p.2.

and Detached Magistrate

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or places to be seized.

U.S. Const. Amend. IV.  The Fourth Amendment contains two separate clauses independent of each other.  Barona, 56 F.3d at 1092 n.1.  The first part of the Fourth Amendment prohibits "unreasonable" searches and seizures while the second clause more commonly known as the "Warrant Clause" describes the procedures to be followed in obtaining a search warrant.  Id.  The Warrant Clause requires that when a warrant is issued, it can only be upon a finding of probable cause and by a neutral and detached magistrate.  But see Barona, 56 F.3d at 1092 n.1 ("nothing in the Fourth Amendment suggests that all searches or seizures must be conducted with a warrant and be supported by probable cause.  Indeed, Terry and a long line of Supreme Court authority holds to the contrary").

Of the courts confronted with the limited situations requiring the application of the Fourth Amendment to foreign searches and seizures, none have applied the requirements of the Warrant Clause.  Rather, these courts have applied the Fourth Amendment's reasonableness standard.  Indeed, the Second Circuit has explicitly held that the Warrant Clause of the Fourth Amendment does not apply extraterritorially and the Ninth Circuit has implicitly reached the same conclusion.  See In re Terrorist Bombings of the U.S. Embassies in East Africa, 552 F.3d 157, 167, 170 (2d Cir. 2008) ("In re Terrorist Bombings") (where the Second Circuit reviewed Supreme Court precedent discussing the Warrant Clause and "[a]ccordingly, [] agree[d] with the Ninth Circuit's observation that 'foreign searches have neither been historically subject to the warrant procedure, nor could they

16

be as a practical matter'") (citing <u>Barona</u>, 56 F.3d at 1092 n.1); <u>Barona</u>, 56 F.3d at 1092 n.1 (noting that "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter").  Moreover, while the Supreme Court has not ruled on this issue, it has strongly suggested that the Warrant Clause does not apply to overseas searches because a warrant "would be a dead letter outside the United States."  <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 274 (1990).

Defendant mainly argues that this court should suppress the foreign evidence because the Belize search warrant was not issued by a neutral and detached magistrate and there was no finding of probable cause by Superintendent Guzman.  Def's Supp. Brief at 6-9.  Both of these requirements originate from the Warrant Clause of the Fourth Amendment which do not apply to foreign searches.  Given the sovereignty of each nation to create their own laws and procedures of implementation, foreign searches as a practical matter could not be subjected to the Warrant Clause.  <u>Barona</u>, 56 F.3d at 1092 n.1 ("Like the search and seizure involved in <u>Terry</u>, foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter").  As such, these arguments are without merit and should be disregarded without need for further analysis.

2.    <u>There Was Probable Cause to Issue the Belize Search Warrant</u>

Although the Warrant Clause does not apply in the limited circumstances that foreign searches are afforded some Fourth Amendment protections, the facts support that the BPD officers provided evidence supporting the existence of probable cause to Superintendent Guzman in order to obtain the search warrant.  Defendant mistakenly states that the Government has not provided any evidence to this Court of what was submitted to Superintendent Guzman to obtain the search warrant.  Def's Supp. Motion at 9.  Inspector Moreira supplemental declaration clearly states that the officers presented the flash drive containing images of a nude female Belize minor and that

17

Superintendent Guzman reviewed the contents of the flash drive prior to signing the search warrant. Moreira Supp. Decl. ¶ 2. The USB thumb drive provided to and reviewed by Superintendent Guzman displayed a video of the defendant fondling a minor girl's bare breasts and also contained other images of minor children engaging in sex acts with adults. Garcia Decl. ¶ 11. The search warrant presented to Superintendent Guzman set forth the defendant's name and Inspector Moreira specifically informed Superintendent Guzman that the flash drive contained images of that male suspect sexually assaulting teenager. Id.; Belize Search Warrant (Docket No. 19, Exh. 4). Moreover, while the search warrant does not use the words "probable cause," it essentially makes such a finding in stating "there is reason to suspect." Belize Search Warrant (Docket No. 19, Exh. 4).

The facts before this Court support that Superintendent Guzman issued the search warrant after reviewing the evidence and making a determination of "reason to suspect" that evidence of a violation of the Belize law would likely be found at Flath's residence. "Probable cause demands no more than a proper 'assessment of probabilities in particular factual contexts.'" Stokes, 710 F. Supp. 2d at 701(citing Gates, 462 U.S. at 232). Certainly, the evidence presented to Superintendent Guzman for a finding of "reason to suspect" supports the existence of probable cause.

Even if there is no explicit finding of the existence of probable cause by Superintendent Guzman, all the facts support the existence of probable cause. The Stokes court without knowledge of the evidence provided to the Thai court to obtain the search warrant, conducted its own analysis based on the information known to law enforcement at that time and found that the "information would have almost certainly been sufficient to establish probable cause for the search that took place." 710 F. Supp. 2d at 701. Likewise, this Court can review the facts as set forth in the declarations, and although not necessary, can review the thumb drive submitted to Superintendent

18

Guzman to make its independent determination of the existence of probable cause in conducting its totality of the circumstances analysis to determine the reasonableness of the foreign. See id.

Review of the facts submitted to this Court supports the existence of probable cause. The individual who initially contacted the U.S. Embassy was not anonymous but identified as the restaurant owner of the Inn. Garcia Decl. ¶ 9. The Manager of the Inn who found the USB thumb drive was also not anonymous but identified as an employee of the defendant's daughter and therefore faced possible retaliation from the defendant. Garcia Decl. ¶ 10. The restaurant owner knew the defendant personally and was able to identify him in the video and provide information about defendant's activities. Garcia Decl. ¶ 11. Both the restaurant owner and Inn Manager identifiedthe Minor on the usb thumb drive. Garcia Decl. ¶ 11.

Both Inspector Moreira and another BPD officer personally reviewed the video of defendant molestingthe minor. Moreira Decl. at p.1; Garcia Decl. ¶ 17. Superintendent Guzman also reviewed the video. Moreira Supp. Decl. ¶ 2. PC Ek, one of the BPD officers involved in the search of defendant's residence, was familiar with defendant's identity based on defendant's prior arrest for a firearms violation. Ek Decl. at p.1.

The video of defendant fondling the breasts of the minor showed a likelihood of a violation of the Belize law. That a video was discovered made it clear that instruments of the offense such as a camera or video taping device was used in the commission of the crime, and that the video was of a molestation occurring in a room necessitated the use of a private location. Furthermore, identities of both the defendant and the minor were known. Moreover, given the small number of residents within the village, the degree of intimacy between the residents, and the confirmation of the identities of both the defendant and the minor as residing in Copper Bank Village, sufficient probable cause existed to search defendant's residence. See Government's Consolidated Sur-Reply

19

at 18-19 (Docket No. 33) (citing cases in support of the finding of probable cause).

       3.      <u>The BPD's Officers Search of Flath's Residence Meets the</u>
                       <u>Fourth Amendment's Reasonableness Requirement</u>

The defendant does not argue that Superintendent Guzman does not have proper authority under Belize law to issue search warrants, nor does the defendant argue that the BPD officers did not follow the Belize law and protocol in obtaining and executing the search warrant. Def's Supp. Motion at p.8. Rather, he argues that the Belize law and protocol themselves violate the Warrant Clause's requirement because it permits a high level member of the Belize Police Department (rather than a neutral and detached magistrate) to issue the search warrant and because the warrant was issued without an explicit finding of "probable cause."

While the Seventh Circuit has not yet addressed when a foreign search meets the Fourth Amendment's reasonableness requirement, the Northern District of Illinois in <u>United States v. Stokes</u>, 710 F. Supp. 2d 689, 700 (N.D. Ill. 2009), adopted the Second Circuit's "totality of the circumstances" test to determine reasonableness. The <u>Stokes</u> court confronted with a foreign search resulting from a joint venture, found that "[t]o determine whether a search is reasonable under the Fourth Amendment, the court must examine the totality of the circumstances, balancing 'on the one hand, the degree to which it intrudes upon the individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" <u>Stokes</u>, 710 F. Supp. 2d at 701 (citing <u>Samson v. California</u>, 547 U.S. 843, 848 (2006); <u>see also</u> <u>In re Terrorist Bombings</u>, 552 F.3d at 172 (applying the totality of the circumstances test to determine whether the foreign search was reasonable under the Fourth Amendment).

In determining whether the totality of the circumstances support that a foreign search meets the Fourth Amendment's protection against unreasonableness searches and seizures, the <u>Stokes</u> court

20

looked at whether the information that the law enforcement officers possessed would have established probable cause (even if not explicitly made by the foreign entity, see supra), the time of day that the search occurred, whether the search was pursuant to a validly issued foreign warrant,[4] not conducted covertly, conducted in the presence of the defendant, conducted with the compliance of the defendant, whether the defendant had the freedom to observe the search and communicate with them during the execution, how the defendant was treated during the search, the manner in which items were retrieved, whether the search was conducted orderly, and the length time to complete the search. Id. at 701-02. The Stokes court noted that "[w]hile any search of a home is an invasion of privacy, Thai and U.S. officials acted reasonably to minimize the intrusiveness of the search in this case" and found that "[t]he conduct of the search was not unreasonable." Id. at 702.

The factors cited by the Stokes court all go to the finding that the search here of defendant's home by the BPD met the Fourth Amendment's protection against unreasonable searches and seizures. The information possessed by law enforcement before the search would have established probable cause for the search. See discussion supra at § I.C.1. The search commenced at approximately 2:30 p.m. and lasted about 1 ½ - 2 hours. Moreira Decl. at p. 1; Trachtenberg Decl. ¶ 17. The search was conducted pursuant to a valid warrant. See generally Moreira Decl.; Moreira Supp. Decl.; Ek Decl.; Belize Search Warrant (Docket No. 19, Exh. 4). The search was not conducted covertly by sneaking into defendant's home without his awareness, but openly. Ek Decl. at p.1. The BPD officers first knocked and then entered the building after defendant opened the door. Id. PC Ek both showed and read the search warrant to the defendant so that defendant was

---

[4] The Stokes court noted that although the magistrate wrongly issued a search warrant for narcotics rather than evidence of child exploitation, the warrant on its face was validly issued.

Case 2:11-cr-00069-WCG   Filed 11/04/11   Page 21 of 27   Document 50

aware of the items at issue during the search.  Id.  Defendant permitted the officers into his residence and PC Ek introduced himself to defendant's common law companion, Vilma Ramirez.  Id.  PC Ek further advised defendant Flath that the defendant had to witness the search of the residence in accordance with police protocol.  Id.  The search was conducted in both the presence of the defendant and Ms. Ramirez.  Id.  The BPD officers conducted the search of defendant's residence in an orderly manner, beginning with the downstairs and then moving to the second floor.  Garcia Decl. ¶ 23.  Inspector Moreira directed the search, determined the areas to be searched, and the items to be inspected and returned, although the other BPD officers conducted the actual physical search of the areas.  Garcia Decl. ¶ 23.  Crime Scene Technician Moh seized the actual items and created an inventory.  Garcia Decl. ¶ 24; Ek Decl. at p.1.

When inspecting an item, the BPD officers proceeded by first showing the item to Flath and/or Vilma, asking them any questions about it, and then either seizing it or putting it back. Garcia Decl. ¶ 24.  The BPD officers replaced all the items which they did not seize and only moved the items which they needed to in order to conduct their search.  Garcia Decl. ¶ 24.  Items ultimately seized were turned over to Crime Scene Technician Moh who collected the evidence and created an inventory.  Garcia Decl. ¶ 24.

The totality of the circumstances of the search of defendant Flath's residence in how the search in this instant case was executed is even more reasonable than in Stokes.  The warrant in Stokes advised defendant that the search was for evidence related to narcotics related violations, but then evidence of child exploitation offenses were seized instead.  Id. at 701.  Yet, the court there found that the reasonableness requirement of the Fourth Amendment was met based on the totality of the circumstances.  Notably, the defendant's challenge to the Belize search warrant is only based on the argument that it did not adhere to the Warrant Clause.  Nowhere does defendant allege that

the actual search of his residence was conducted unreasonably, nor does the defendant contests the facts articulated above. Defendant does not allege that he was mistreated by any BPD officers or U.S. investigators, but solely argues that because the Belize search warrant does not meet the Warrant Clause requirement of the Fourth Amendment, the search of defendant's residence conducted pursuant to that warrant is *de facto* unreasonable. The defendant's position in light of the cases discussing this issue is untenable. Moreover, even in <u>Stokes</u> which involved a search executed with a defective warrant, the district court looked at the factors comprising the totality of the circumstances and found that despite the problematic nature of the warrant, the search was conducted reasonably and therefore did not violate the Fourth Amendment.

Under the totality of the circumstances, the search of Flath's residence was reasonable and therefore this Court should find that the Fourth Amendment's reasonableness standard is satisfied and deny defendant's motion to suppress on this basis as well.

**D.    The Good Faith Exception to the Exclusionary Rule Applies, and Thus the Motion to Suppress Should Be Denied**

Even if this court finds first that the joint venture doctrine applies, and then that the search was not conducted reasonably, defendant's motion to suppress should nonetheless be denied under the good-faith exception to the exclusionary rule.

While the Seventh Circuit has not yet addressed the application of the good faith exception to the exclusionary rule in foreign search cases, the only other court in this Circuit confronted with a similar situation, adopted the Ninth Circuit's analysis and applied the good-faith exception to foreign searches. <u>See</u> <u>Stokes</u>, 710 F. Supp. 2d at 703 ("It is well settled that the exclusionary rule does not apply when police act in objectively reasonable reliance on a subsequently invalidated search warrant...The same 'reasoning applies as well to reliance on foreign law enforcement

23

officers' representations that there has been compliance with their own law'") (citations omitted); see also United States v. Molina-Chacon, 627 F. Supp. 1253, 1259 (E.D.N.Y. 1986) (The guiding principle is that the exclusionary rule is not a constitutional right of an individual but rather a judicially created device to deter United States police misconduct, to be applied only in those situations where this objective can be achieved) (citing United States v. Janis, 428 U.S. 433, 446–47 (1976)).

Defendant argues that the good-faith exception does not apply in the instant case because the Belize search warrant was not based upon a finding of probable cause or issued by a neutral and impartial magistrate. As previously addressed, there is no basis to subject foreign warrants to the Fourth Amendment's Warrant Clause requirements.

Rather, the court in determining the admissibility of evidence seized by foreign officials "must inquire whether exclusion will deter federal officers from unlawful conduct." United States v. Andreas, No. 96 CR 762, 1998 WL 42261, at *2 (N.D. Ill. Jan. 30, 1998 ) (unpublished) (citing Peterson, 812 F.2d at 491). Where there is no evidence of misconduct by the United States investigators but rather good faith that the foreign law was being complied with, suppression here would not serve a deterrent purpose and the purpose of the exclusionary rule would not be achieved. See generally, Molina-Chacon, 627 F. Supp at 1259-60 (citing United States v. Rose, 570 F.2d 1358, 1362 (9th Cir.1978); United States v. Morrow, 537 F.2d 120, 140 (5th Cir. 1976). Suppression of foreign evidence for a Fourth Amendment violation is an extreme measure and as the Second Circuit has noted,

> There exists no case, so far as we are aware, which suppresses evidence obtained in a foreign country under such conditions, regardless of whether the foreign officers failed to follow American constitutional procedures or of the extent to which American agents may have been involved in their activities. The courts can hardly be said to have spoken with one voice in articulating the reasons for their decisions,

24

but as a statistical matter they have apparently been unanimous in rejecting attempts to suppress the challenged foreign evidence.

Molina-Chacon, 627 F. Supp. at 1259 (citing Stowe v. Devoy, 588 F.2d 336, 342 (2d Cir.1978)).

The facts before this court support that the BPD officers followed their own law and procedure in executing a search of the defendant's residence. The BPD officers obtained a search warrant, and then when they executed it, in accordance with their procedure showed the warrant to the defendant, and then made sure he was present and observing the actual execution of the search. Indeed Inspector Moreira appeared to be even more cautious to make sure defendant would later argue a violation of his rights, in light of his status as a U.S. citizen. Garcia Decl. ¶ 19.

In the instant case, Inspector Moreira represented that he would investigate the contents of the USB thumb drive and thereafter obtain a search warrant. Garcia Decl. ¶ 15; Trachtenberg Decl. ¶ 9. Thereafter, Investigator Garcia personally observed Inspector Moreira conduct his own investigation of the evidence, and after review recommend a search warrant and an initiation of an investigation.[5] Garcia Decl. ¶ 17. Investigator Garcia also was present when Inspector Moreira announced that he had obtained the necessary search warrant and that they would then proceed to execute it at the defendant's residence. Moreira Supp. Decl. ¶ 3. Investigator Trachtenberg witnessed the BPD officer showing the defendant the warrant at the time of execution. Trachtenberg Decl. ¶ 13.

---

[5] Investigator Garcia is employed by the United States Embassy in Belmopan, Belize, but is a citizen and national of Belize. Garcia Decl. ¶ 2. Prior to working as a Foreign Service National Investigator with the U.S. Embassy, Investigator Garcia worked in a support role with the BPD and consequently was required to be familiar with the BPD's Standard Operating Procedures and Belize Criminal Laws. Garcia Decl. ¶ 6. Investigator Garcia acquired knowledge of the Belize Criminal Law and BPD Standard Operating Procedures during his military career with the Peace Corps as a Safety and Security Coordinator, and provided training of such to the volunteers and soldiers. Garcia Decl. ¶ 7.

At no point does defendant argue that the BPD officers did not follow their law or that Investigators Trachtenberg or Garcia had any basis to believe that the BPD officers were contravening their law or practice. Indeed, the only basis again is attack on the Belize law itself for not meeting the requirements of the Warrant Clause. The application of the good-faith exception to foreign searches does not turn on the reasonableness of the foreign law or protocol themselves, but rather on U.S. law enforcement's good faith reliance on foreign law enforcement's representations.

There is no deterrent function in excluding evidence if U.S. officials reasonably believed their actions were legal: holding officers liable "for failings of their foreign associates would be even more incongruous than holding law enforcement officials to a strict liability standard as to the adequacy of domestic warrants." Peterson, 812 F.2d at 492. The facts support that the good-faith exception to the exclusionary rule also applies here. Defendant's motion to suppress should also be denied on that basis.

## CONCLUSION

For the reasons stated above and in the Government's Response and Sur-Reply, this Court should deny the Defendant's Motion to Suppress.

Dated this 4th day of November, 2011, at Milwaukee, Wisconsin.

JAMES L. SANTELLE
United States Attorney

By:    s/Penelope L. Coblentz
Assistant United States Attorney
Penelope L. Coblentz Bar Number: 1006310
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin

26

517 East Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: Penelope.Coblentz@usdoj.gov

s/ Mi Yung C. Park
_____
Mi Yung Claire Park (CA bar 202379)
Trial Attorney - Child Exploitation and Obscenity
Section
1400 New York Ave., NW - Suite 600
Washington, D.C. 20005
(202) 616-2780; Fax: (202) 514-1793
miyung.park@usdoj.gov