# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    v.                                                                                                   **Case No. 11-CR-69**

**ROLAND J. FLATH,**

    **Defendant.**

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On March 22, 2011, a grand jury sitting in the Eastern District of Wisconsin returned an indictment against defendant Roland J. Flath ("Flath") alleging that the defendant, a citizen of the United States, did travel in foreign commerce, from the United States to Belize, and engaged in and attempted to engage in illicit sexual conduct as defined in 18 U.S.C. § 2423(f), with a person less than 18 years of age in violation of 18 U.S.C. § 2423(c) and (e).

Before the Court is Flath's Motion to Suppress.[1] Flath seeks to suppress all items seized from his residence in Belize pursuant to a Belizean warrant. Flath also seeks to suppress electronic evidence seized pursuant to a warrant issued by the United States District Court for the District of Columbia as fruit of the Belizean warrant. (Def.'s Mot. to Suppress at 1, Docket # 15.)[2] He argues that the Belizean warrant was not issued by a neutral and detached magistrate and not supported by

---

[1] I have issued Orders and Recommendations on Flath's Motion for Bill of Particulars, Motion to Dismiss for Duplicity, and Extension on Motion to Suppress (Docket # 41) and Flath's Motion to Dismiss. (Docket # 40.)

[2] Flath's room at the Copper Bank Inn in Corozal, Belize was also searched; however, this search was conducted pursuant to Flath's consent. Flath does not challenge his consent to the search of his room at the Copper Bank Inn.

probable cause. For the same reason, Flath argues that the search of the residence was unreasonable. Because the Warrant Clause of the Fourth Amendment does not apply to overseas warrants, Flath's challenge of the Belizean warrant fails. Also, I find that based on the totality of the circumstances, the search was not unreasonable. I will therefore recommend that Flath's Motion to Suppress be denied.

## PROCEDURAL HISTORY

Flath challenges the search of his residence in Belize. Resolution of his motion has been delayed because the discovery regarding this search had to be obtained through international protocols. Consequently, both parties requested and were granted extensions to supplement the factual record and identify disputed material facts warranting an evidentiary hearing.

In opposition to Flath's motion and request for an evidentiary hearing, the government initially filed two declarations from two officials from the United States Embassy. After the close of the briefing deadline, I held a conference on the status of this motion on July 8, 2011. The parties were directed to meet and confer on any stipulated and disputed material facts.

On August 18, 2011, the government submitted three additional declarations from members of the Belize Police Department on how the investigation was initiated and how the search was conducted. (Docket # 36.) On August 19, 2011, I entered an order directing the parties to meet and confer once again to determine specifically which, if any, facts contained in the five declarations were in dispute. (Docket # 38.) The defendant responded by stating he did not contest any of the facts set forth in the five declarations; however, the defendant believed that additional information about the issuance of the search warrant was needed before the suppression issue could be decided. (Docket # 39.) Specifically, the defendant believed information regarding who was involved in obtaining the

search warrant and the information given to the issuing officer was necessary to decide the motion. (Docket # 44.)

On September 28, 2011, a second status conference was held in which the government indicated it was working to obtain an additional declaration from the Belize government addressing the defendant's requests for information. (*Id.*)

On October 12, 2011, the government submitted an additional declaration addressing these issues. (Docket # 45-1.) I then entered an order asking the defendant, in light of the additional declaration, to state his position regarding the need for an evidentiary hearing. (Docket #46.) The defendant responded by raising additional questions he believed showed disputed material facts warranting an evidentiary hearing. (Docket # 47.) By separate order, the request for an evidentiary hearing was denied on October 19, 2011. (Docket # 48.) However, the parties were allowed to supplement their briefs in light of the additional declaration filed. (*Id.*)

Both parties have submitted their supplemental briefs (Dockets # 49, 50) and this motion is now ready for resolution.

## FACTS

The undisputed facts are taken from the six declarations submitted by the government.

### *The Six Declarations*

The government submitted the declarations of two officials with the United States Embassy in Belize: Foreign Service National Investigator Baltazar Garcia ("Garcia") and Assistant Regional Security Officer Paul Trachtenberg ("Trachtenberg"). (Declaration of Baltazar Garcia ("Garcia Decl."), Docket # 22-1); (Declaration of Paul Trachtenberg ("Trachtenberg Decl."), Docket # 22-2.) Both Garcia and Trachtenberg were present during the search of Flath's

residence; however, both state they did not participate in the search. (Garcia Decl. ¶ 30; Trachtenberg Decl. ¶ 21.)

The government has also submitted the declarations of three members of the Belize Police Department ("BPD") who were also present during the search: Inspector of Police James Moreira ("Moreira"), Detective Constable Roy Ek ("Ek"), and Crime Scene Technician Lucas Moh ("Moh"). (Declaration of James Moreira ("Moreira Decl."), Docket # 36-1); (Declaration of Roy Ek ("Ek Decl."), Docket # 36-2); (Declaration of Lucas Moh ("Moh Decl."), Docket # 36-3.) Additionally, the government submitted a second declaration from Moreira. (October 11, 2011 Declaration of James Moreira ("Oct. 11 Moreira Decl."), Docket # 45-1.) The defendant has stated he does not contest any of the facts set forth in the five declarations initially filed by the government. (Docket # 39.) Although the defendant raised additional questions in response to the October 11, 2011 Moreira declaration, the defendant does not contest the facts set forth in the declaration. (Docket # 47.) Accordingly, this motion is decided on the undisputed facts set forth in the six declarations.

*The Search*[3]

On June 14, 2010, the owner of a restaurant in the Copper Bank Inn in Copper Bank Village, Corozal, Belize (the "complainant") contacted the U.S. Embassy and stated that she had a video of an American molesting a minor child. (Garcia Decl. ¶ 10.) The U.S. Embassy in Corozal then provided the information to the U.S. Embassy's Consular Services in Belmopan, Belize, who contacted the complainant. (Garcia Decl. ¶ 9.) The complainant advised that the

---

[3] For ease of reference, actions taken by either of the United States officers, Garcia and Trachtenberg, will be referred to as the "U.S. officers" and actions taken by any of the Belizean officers, Moreira, Ek, Moh, or any member of the BPD, will be referred to as the "Belizean officers."

manager of the Inn had discovered a USB thumb drive that contained images of child pornography, as well as a video of Flath fondling the breasts of a minor, who was then a 14 year old girl in Copper Bank Village. (Garcia Decl. ¶ 11.) The manager had discovered this thumb drive while cleaning a room that Flath occupied at the Inn. (Garcia Decl. ¶ 10.) Upon viewing the video, the manager recognized Flath as the adult male in the video. (Garcia Decl. ¶ 11.) The complainant also recognized Flath because he keeps a room at the Inn where he uses the computer and internet. (Garcia Decl. ¶ 11.)

The Consular Officer forwarded the complainant's statement to the U.S. State Department Diplomatic Security Service Regional Security Office ("RSO") and the U.S. State Department Diplomatic Security Service ("DSS") responded by sending a U.S. officer to meet with the complainant and review the thumb drive. (Garcia Decl. ¶ 10.) The U.S. officer confirmed the contents of the thumb drive and reported the information back to the RSO. (Garcia Decl. ¶ 12.) The RSO sent an additional U.S. officer to assist in the investigation. (*Id.*)

The U.S. officers met with a Belizean officer in Corozal on June 15, 2010 and provided the Belizean officer with the thumb drive. (Garcia Decl. ¶ 14; Trachtenberg Decl. ¶ 9; Moreira Decl. at 1.) The U.S. officer informed the Belizean officer that there was a likelihood of additional electronic media at Flath's residence and at the Inn. (Trachtenberg Decl. ¶ 9.) The U.S. officer further informed the Belizean officer that the evidence on the thumb drive showed violations of U.S. and Belizean law. (*Id.*) The U.S. officer expressed an interest in pursuing a possible U.S. prosecution, but only after the Belize police completed their investigation and prosecution. (*Id.*) The Belizean officer took the thumb drive and indicated that he could likely obtain a search warrant. (*Id.*)

The Belizean officer then traveled to the BPD and the U.S. officers followed in a separate vehicle. (Garcia Decl. ¶ 16; Trachtenberg Decl. ¶ 10.) At the police station, one U.S. officer went inside and one remained outside. (*Id.*) The Belizean officer ordered another Belizean officer to obtain and execute a search warrant at Flath's residence. (Moreira Decl. at 1.) A Belizean officer obtained the search warrant from Police Superintendent Miguel Guzman ("Guzman"), as allowed by Belizean law. (*Id.*); (Ek Decl. at 1.) Before signing the search warrant, Guzman reviewed the contents of the thumb drive in the presence of a Belizean officer. (Oct. 11 Moreira Decl. ¶ 2.) After obtaining the search warrant, a Belizean officer informed several other Belizean officers a search warrant had been obtained and would be executed on Flath's residence. (*Id.* ¶ 3.) A U.S. officer was present when this conversation between the Belizean officers took place. (*Id.*) The Belizean officer asked the U.S. officers whether they would accompany the Belizean officers when they executed the search warrant. (Garcia Decl. ¶ 19.) The U.S. officers informed the Belizean officer they would like to accompany the Belizean officers as Flath was a U.S. citizen. (*Id.*) The Belizean officer agreed the presence of the U.S. officers during the search was a good idea as it would ensure that Flath did not later allege that the Belizean officers violated his rights. (*Id.*) The Belizean officers left for Copper Bank Village and the U.S. officers followed in a separate vehicle. (Garcia Decl. ¶ 22; Trachtenberg Decl. ¶ 11.)

Upon arriving at Flath's residence, the majority of the Belizean officers approached the front door of Flath's residence and knocked on the door. (Trachtenberg Decl. ¶ 13; Ek Decl. at 1; Moreira Decl. at 1.) The U.S. officers, along with a Belizean officer, waited at the back entrance of Flath's residence. (Trachtenberg Decl. ¶ 13.) When the Belizean officers knocked on the front door, Flath attempted to leave the residence from the back door but was stopped by U.S. officers

and the Belizean officer at the back door. (*Id.*) A U.S. officer secured Flath for officer safety until Flath reentered the residence. (*Id.*)

A Belizean officer showed Flath the search warrant and read it to him. (Ek Decl. at 1.) Flath and his girlfriend were both present in the residence during the search. (Garcia Decl. ¶ 23; Trachtenberg Decl. ¶ 13; Ek Decl. at 1; Moreira Decl. at 1.) The Belizean officers began searching the residence. The search began on the ground floor and then moved to the second floor. (Garcia Decl. ¶ 23; Trachtenberg Decl. ¶ 14; Ek Decl. at 1; Moreira Decl. at 1.) While the Belizean officers were searching the ground floor, a U.S. officer approached Flath to question him. (Trachtenberg Decl. ¶ 14.) Prior to speaking to him, the U.S. officer read Flath his *Miranda* rights "out of an abundance of caution," even though Flath was not under arrest. (*Id.*) Flath waived his *Miranda* rights and agreed to speak with the U.S. officer. Flath admitted to downloading images of children performing sexual acts from the internet and to touching the Belizean minor's breasts. Flath signed a statement admitting to downloading the photographs and to touching the Belizean minor. (*Id.*) The U.S. officer showed Flath some of the images printed from the thumb drive and asked Flath whether he was planning on sending the images to anyone else. (*Id.*) Flath then invoked his *Miranda* rights and requested an attorney. (*Id.*)

The Belizean officers then searched the upstairs. (Trachtenberg Decl. ¶ 16.) A U.S. officer followed the Belizean officers upstairs and observed the search but did not participate in the search. (Garcia Decl. ¶ 23.) The Belizean officers directed the search, determined the areas to be searched and the items to be inspected and either seized or returned, and conducted the search. (Garcia Decl. ¶ 23; Oct. 11 Moreira Decl. ¶¶ 5-6.) When inspecting an item, the Belizean officers proceeded by first showing the item to Flath and/or his girlfriend, asking them questions about it,

and then either seized the item or returned it. (Garcia Decl. ¶ 24.) The Belizean officers replaced all the items which they did not seize and only moved the items which they needed to in order to conduct their search. (*Id.*) Seized items were turned over to a Belizean officer who collected the evidence and created an inventory. (*Id.*)

The search lasted approximately 1 ½ - 2 hours and was conducted in the daytime. (Trachtenberg Decl. ¶ 17; Moreira Decl. at 1.) Flath was not handcuffed or restrained during the search. (Trachtenberg Decl. ¶ 17.) The evidence remained in the custody of the Belizean officers until the RSO requested and received permission to obtain copies of the evidence in mid-July 2010. (*Id.* ¶¶ 22, 24.) The original evidence was returned to the BPD a few days later. (*Id.* ¶ 24.) A Belizean officer who participated in the search referred to the search as a "joint operation" between U.S. and Belizean officers. (Moh Decl. at 1.)

## ANALYSIS

In moving to suppress all fruits of the Belizean warrant, Flath offers three interrelated arguments: (1) the United States substantially participated in the search of Flath's home in Belize to trigger application of the Fourth Amendment; (2) the Belizean warrant does not comport with the Fourth Amendment requirements; and (3) the search was unreasonable because it was based on a warrant which did not meet Fourth Amendment requirements. I will address each in turn.

### 1. Did the United States Agents Substantially Participate in the Search of Flath's Home in Belize?

Generally, Fourth Amendment principles do not apply to searches by foreign authorities in their own countries, even if the targets of the search are American citizens. *United States v. Stokes*, 710 F. Supp. 2d 689, 697 (N.D. Ill. 2009); *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 167 (2nd Cir. 2008). An exception occurs, however, when the participation of United

States agents is so substantial as to convert the search into a joint venture.[4] *Stokes*, 710 F. Supp. 2d at 697; *see also United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987); *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976). When foreign authorities are acting on behalf of the United States agents or at the United States agents' behest, this participation may be substantial enough to convert the search into a joint venture. *See Stokes*, 710 F. Supp. 2d at 697. Although the Seventh Circuit has not embraced the term "joint venture" as used by other courts, the analysis appears to be similar: whether the level of involvement of the U.S. government agents was sufficient enough for them to be considered participants in the actions of the foreign police. *United States v. Marzano*, 537 F.2d 257, 270 (7th Cir. 1976), *abrogated on other grounds by Carter v. United States*, 530 U.S. 255 (2000).

In arguing that he is subject to the protection of the Fourth Amendment, Flath contends that the "joint venture" doctrine is applicable to his case. I disagree. To be clear, the record shows cooperation between the U.S. officers and Belizean officers. And a Belizean officer believed the search to be a "joint operation." But, whether the search is a joint venture depends on the level of U.S. participation. *See Marzano*, 537 F.2d at 271 (finding that Grand Cayman officer's intent to help the United States was not a sufficient reason to treat his actions as those of United States agents); *United States v. Baboolal*, No. 05-CR-215, 2006 WL 1942357, *3 (E.D. Wis. July 11, 2006) ("[T]he mere fact that the Canadians and Americans were cooperating as part of the Toronto Strategic Partnership does not transform any subsequent search into a joint venture."). That the U.S. also expressed interest in prosecuting Flath for violation of U.S. laws does not alter the analysis. *See*

---

[4] Another exception is recognized where the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience. *See Morrow*, 537 F.2d at 139; *United States v. Cotroni*, 527 F.2d 708, 712 n.10 (2nd Cir. 1975); *United States v. Callaway*, 446 F.2d 753, 755 (3rd. Cir. 1971). Flath has not alleged that the conduct in this case shocks the judicial conscience.

*Marzano*, 537 F.2d at 271; *Baboolal*, 2006 WL 1942357, at *3 (stating that "if the fact that the case ultimately ends up in a United States court was significant, the [joint venture] doctrine would apply in virtually all cases involving foreign searches").

At the outset, I see a distinction between the U.S. officers' involvement in the search at issue and in the interrogation of Flath which is not at issue. The U.S. was substantially involved in Flath's interrogation. A U.S. officer read Flath his *Miranda* rights, questioned him, and showed him incriminating evidence.

By contrast, the U.S. officers' level of involvement in the search, on which I must focus, was more peripheral. *Marzano*, 537 F.2d at 270 (whether the Government participated as to render the search a Government action must be determined by examining the facts surrounding the search). Here, the U.S. officers' involvement in the search was as follows. The U.S. officers passed the incriminating video to the local Belizean police which launched the investigation. The U.S. officers accompanied Belizean police to get the search warrant. The U.S. officers accompanied Belizean police to the residence. The U.S. officers waited at the back door with Belizean police upon arrival at the residence. The U.S. officers stopped and secured Flath at the back door when he tried to leave. The U.S. officers were present but did not participate in the search.

These facts do not support a finding that the U.S. officers' actions in the search were so substantial as to be considered participants in the search. Passing of information and presence during the search are not sufficient. *Marzano*, 537 F.2d at 270 ("[T]he law is clear that providing information to a foreign functionary is not sufficient involvement for the Government to be considered a participant in acts the foreign functionary takes based on that information . . . Mere presence of federal officers is not sufficient to make the officers participants.").

Moreover, even though there was cooperation between the U.S. officers and the Belizean officers from the inception of the investigation, the actual search and seizure was conducted by the Belizean police. A Belizean officer took custody of the thumb drive and reviewed it. A Belizean officer sought and obtained a search warrant for violation of Belizean law. A Belizean officer directed the search and determined the areas to be searched. A Belizean officer showed Flath the search warrant and read it to him. A Belizean officer showed items being seized to Flath. A Belizean officer collected the items seized and created an inventory for items seized. Finally, the items recovered during the search remained in the custody of the Belizeans and were lent to U.S. officials a month later and ultimately returned.

These facts are in direct contrast to *Stokes*, where the court found a joint venture. In *Stokes*, the defendant was a U.S. citizen whose home in Thailand was searched by Thai police with assistance from American Immigration and Customs Enforcement ("ICE") agents pursuant to a Thai search warrant. The ICE agents alone recovered and were first to examine the evidence found. 710 F. Supp. 2d at 697. ICE agents encouraged the defendant to comply with the search and assisted in the removal of evidence. *Id.* Finally, although evidence was initially seized by Thai authorities, the evidence was turned over to ICE agents on the same day of the search. *Id*.

Nonetheless, even if I found that U.S. officers substantially participated in the search, thus implicating the Fourth Amendment, the ultimate issue is whether Flath has asserted a Fourth Amendment claim on which he can get relief. For the reasons discussed below, I find that he has not.

### 2. *Must The Belizean Warrant Comport With The Fourth Amendment?*

As discussed above, the search of Flath's home in Belize was conducted pursuant to a Belizean warrant. Flath, a United States citizen, claims the procedure by which the Belizean warrant

was obtained did not meet the Fourth Amendment requirements. (Def.'s Mot. to Suppress at 6-7, Docket # 15.) Specifically, Flath argues that the warrant was not issued by a neutral and detached magistrate and was not based upon a finding of probable cause.

The government argues that even if the Fourth Amendment is implicated, only the reasonableness standard applies to foreign searches and not the Warrant Clause or probable cause; law enforcement officers acted reasonably during the conduct of the search; and American law enforcement officials relied in good faith on the Belizean authorities. (Gov't Response at 29-39, Docket # 22.)

"[T]he purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own government." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990). As most courts have observed, the amendment contains two independent clauses. *United States v. Barona*, 56 F.3d 1087, 1091 n.1 (9th Cir. 1995). The first clause prohibits unreasonable searches and seizures. *Id.* The second clause, the Warrant Clause, describes the procedures that must be followed in obtaining a warrant. *Id.* "The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, in certain limited circumstances neither is required.'" *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)(internal quotations omitted)).

In this case, by challenging the procedure by which the Belizean warrant was obtained, Flath's claim is grounded in the Warrant Clause. To reiterate, the Warrant Clause describes the requirements for obtaining a warrant. The clause requires that, before a valid search may take place,

police must obtain a warrant from a neutral and disinterested magistrate based on a showing of probable cause. *United States v. Robinson*, 546 F.3d 884, 887 (7th Cir. 2008).

The question presented here is, assuming the applicability of the Fourth Amendment, does the Warrant Clause apply to the Belizean warrant? I have not found any case, and Flath presents no authority, that holds that the Warrant Clause applies abroad. Though the Supreme Court has not addressed the issue directly, it has strongly suggested that the Warrant Clause has no extraterritorial application. *Verdugo-Urquidez*, 494 U.S. at 274. (finding no Fourth Amendment violation in a warrantless search of foreign residence of a nonresident alien conducted by U.S. agents).

Additionally, while the Seventh Circuit has not addressed the issue, the only federal appellate court to have considered the issue, the Second Circuit, has held that the "warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness." *In re Terrorist Bombings*, 552 F.3d at 167. A district court in this circuit in *United States v. Stokes*, 710 F. Supp. 2d 689 (N.D. Ill. 2009) has ruled similarly.

In the *Terrorist Bombings* case, U.S. officials wiretapped and searched the home of an American citizen living in Kenya pursuant to a Kenyan warrant that authorized a search for "stolen property." 552 F.3d at 160. The homeowner was suspected of assisting the bombings of American embassies in Kenya and Tanzania, not of possessing stolen property. *Id.* Relying on *Verdugo-Urquidez*, the Second Circuit determined that the Warrant Clause did not apply to any search of a U.S. citizen abroad by American officials. The court offered four reasons for its decision: "First, there is nothing in our history or our precedent suggesting U.S. officials must first obtain a warrant before conducting an overseas search." *Id.* at 169. "Second, nothing in the history of the foreign relations of the United

States would require that U.S. officials obtain warrants from foreign magistrates before conducting searches overseas or, indeed, to suppose that all other states have search and investigation rules akin to our own." *Id.* at 170. "Third, if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation." *Id.* at 171. "Fourth and finally, it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches." *Id.*

In *Stokes*, as in this case, the defendant was a U.S. citizen. As previously discussed, his home in Thailand was searched by Thai police with assistance from American ICE agents pursuant to a Thai search warrant. The *Stokes* court, adopting the reasoning of the Second Circuit, held that the Warrant Clause had no application in Thailand and rejected the defendant's challenges to the sufficiency of the Thai warrant and the scope of the search. 710 F. Supp. 2d at 700. The court concluded that though the Thai warrant at issue may not satisfy the warrant requirements imposed by the Fourth Amendment, its issuance and execution is governed by Thai law and does not offend the Constitution of the United States. *Id.*

Indeed, in this case the warrant was issued by a Superintendent of Police, a police official authorized to issue warrants under Belizean law. There is no indication of a probable cause finding. Rather, the issuing officer found "reason to suspect" that various evidence items would be found. But, as in the cases cited above, I found no authority to apply the Fourth Amendment's Warrant Clause to the Belizean warrant. Accordingly, Flath's challenge to the procedure by which the Belizean warrant was obtained must fail. Even if Flath could demonstrate a "joint venture" between the U.S. officers and the Belizean police, a claim that the Belizean warrant did not comport with the Warrant Clause is not a claim on which he can get relief. In sum, because the Fourth Amendment's

Warrant Clause does not apply to overseas searches, I recommend that Flath's motion to suppress on the ground that the Belizean warrant did not comport with the Fourth Amendment's Warrant Clause be denied.

### 3. *Was the Search Reasonable?*

While there is no authority for applying the Warrant Clause extraterritorially, authority exists for applying the Fourth Amendment's reasonableness requirement abroad. *In re Terrorist Bombings*, 552 F.3d at 167; *Stokes*, 710 F. Supp. 2d at 700. To determine whether a search is reasonable under the Fourth Amendment, the court must examine the totality of the circumstances, balancing "on the one hand, the degree to which it intrudes upon the individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006)(quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)). Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Here, Flath does not allege that the manner in which the search was executed or its scope was unreasonable. Based on the undisputed facts, such an argument would be to no avail. The Belize police had a video of Flath allegedly molesting a minor. The search was conducted pursuant to a Belizean warrant which was read to Flath. The search was conducted in the daytime, lasting approximately 1 ½ - 2 hours. The search was not conducted covertly: both Flath and his girlfriend were present during the search. Flath was not handcuffed or restrained during the search. Items being seized were shown to Flath or his girlfriend. The search warrant authorized the seizure of computers, laptops, and pornographic CDs and photographs and the Belize police only took those items.

(Docket # 19, Exh. 4.) This record amply supports a finding that the search was conducted in a reasonable manner and scope. And the analysis would otherwise end here.

However, Flath contends that the search was unreasonable because the warrant was not issued by a neutral and detached magistrate and was not based on probable cause. (Def.'s Supp. Br. at 10, Docket # 49.) Although the Warrant Clause does not apply to this search, to the extent that this argument has any bearing on the reasonableness of the search, I will address it. I am unpersuaded that the fact the warrant was not issued by a neutral and detached judicial official renders the search unreasonable. If anything, this fact only highlights the difficulty of exporting the Warrant Clause to overseas searches. Justice Kennedy's observation of the impracticality of applying the warrant requirement abroad comes to mind:

> The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.

*Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring). Additionally, this is not a situation where the warrant was issued by someone wholly without legal authority. The issuing official was authorized under Belizean law to issue the warrant.

I am also not persuaded that the search was unreasonable for lack of probable cause. I agree that the warrant makes no explicit finding of probable cause. Rather, it makes "a reason to suspect" finding. Nonetheless, based on the totality of the circumstances, the evidence presented to the issuing official for a finding of "reason to suspect" supports the existence of probable cause.

Probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "In dealing with probable cause, . . .as the very name implies, we deal with probabilities. These are not technical; they are the factual and

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Kimberlin*, 805 F.2d 210, 228 (7th Cir. 1987) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

In this case, the warrant was based on the oath of a Belizean officer. (Docket # 19, Exh. 4.) This Belizean officer had prior contact with Flath and could identify him. (Ek Decl. at 1.) The issuing officer was provided with and reviewed the thumb drive, which had been found in Flath's room at the Inn, prior to signing the search warrant. The thumb drive contained a video of Flath allegedly fondling the breasts of a minor female. The thumb drive also contained other images of minors engaging in sex acts with adults. On these facts, a reasonably prudent person could reasonably conclude that a search of Flath's residence could uncover evidence of a crime. Probable cause requires a probability of or a substantial chance of criminal activity, not an actual showing of criminal activity. *Gates*, 462 U.S. at 244. Thus, it was reasonable for the issuing Belizean officer to find that: "[T]here is reason to suspect that Various Computer Set and Laptops of different name brand [and] Various pornographic CD's and Photographs [a]re concealed in the premises of Roland Flath situated at Copper Bank Village, Corozal District." (Docket # 19, Exh. 4.)

In the end, based on this record, weighing Flath's privacy interest in his home and Belize's interest in investigating violations of its laws, I conclude that the search was not unreasonable. Therefore, I recommend that Flath's motion to suppress the search on the alternative ground of the unreasonableness of the search be denied.

### 4. *Good Faith*

Finally, the government argues that even if the search did not comport with the Fourth Amendment's reasonableness requirement, the Court should still admit the evidence under the good-

faith exception to the exclusionary rule. In this case, the issue of good faith would be ripe for consideration under two circumstances: (1) if the Warrant Clause applied and the Court found the Belizean warrant defective, and/or (2) if the Court found that the search was unreasonable. Having ruled that the Warrant Clause does not apply to the Belizean search and that the search was not unreasonable, the Court need not address the good faith arguments presented.

**IT IS THEREFORE RECOMMENDED** that:

The defendant's motion to suppress be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

**FURTHER, IT IS ORDERED** that the suspension of objections on Recommendations and Orders previously granted is also lifted. (Docket # 43.) The parties are reminded that written objections to those Recommendations are also due within fourteen days of this Recommendation.

Dated at Milwaukee, Wisconsin this 18th day of November, 2011.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge